# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

GRANDMOTHERS GROWING GOODNESS,　)
P.O. Box 89030　)
Nuiqsut, AK 99789;　)
　)
THE WILDERNESS SOCIETY　)
1801 Pennsylvania Ave. NW, Suite 200　)
Washington, DC 20006,　)
　)
　　　*Plaintiffs*,　)
　)
　　　　v.　)
　)
DOUG BURGUM, in his official capacity　)
as Secretary of the Interior　)
1849 C Street, NW　)
Washington, DC 20240;　)
　)
KATHARINE MACGREGOR, in her official　)
capacity as Deputy Secretary of the Interior　)
1849 C Street, NW　)
Washington, DC 20240;　)
　)
U.S. DEPARTMENT OF THE INTERIOR　)
1849 C Street, NW　)
Washington, DC 20240;　)
　)
BILL GROFFY, in his official capacity as　)
Acting Director of Bureau of Land　)
Management　)
1849 C Street, NW　)
Washington, DC 20240;　)
　)
KEVIN PENDERGAST, in his official capacity　)
as Alaska State Director of the United States　)
Bureau of Land Management　)
222 W 7th Avenue #13　)
Anchorage, AK 99513;　)
　)
U.S. BUREAU OF LAND MANAGEMENT　)
1849 C Street, NW,　)
Washington, DC 20240,　)
　)
　　　*Defendants*.　)
　)

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1.      The Bureau of Land Management (BLM) recently opened some of the most ecologically and culturally sensitive lands in the Arctic to oil and gas leasing by misreading its statutory authority, reversing years of factual findings without explanation, and conducting an environmental review that is incapable of supporting its decision. This lawsuit challenges BLM's cancellation of the Teshekpuk Lake Conservation Right of Way (Right of Way), the 2025 Record of Decision (ROD) for the Integrated Activity Plan (2025 IAP) for the National Petroleum Reserve in Alaska (Reserve), the February 11, 2026 Notice of Sale (2026 lease sale) offering leases on tracts within the former Right of Way and tracts south and west of the former Right of Way that BLM has classified as having high oil and gas development potential, and any leases issued on those tracts.

2.      The Reserve is a 23-million-acre tract of federal land on Alaska's North Slope, home to caribou, migratory birds, polar bears, and other wildlife, and central to the subsistence way of life of Iñupiat communities that have depended on its resources for millennia. Congress directed the Secretary of the Interior to balance oil and gas leasing in the Reserve with binding obligations to protect environmental and subsistence values. The Naval Petroleum Reserves Production Act (Reserves Act) requires the Secretary to impose "conditions, restrictions, and prohibitions" to mitigate adverse effects on surface resources. 42 U.S.C. § 6506a(b). For designated "special areas," including the TLSA, Congress required that activities "shall be conducted in a manner which will assure the maximum protection of such surface values to the extent consistent with the requirements of this Act for the exploration of the reserve." *Id.* § 6504(a).

3.     For four decades, BLM honored these mandates. From 1983 through 2024, every BLM planning decision closed or deferred from leasing some portion of the TLSA's core lands around Teshekpuk Lake. BLM repeatedly found that general lease stipulations were insufficient to protect the Teshekpuk Caribou Herd's (Herd) critical calving, insect-relief, and migration habitat, and that leasing restrictions were necessary to fulfill the Reserves Act's conservation mandates.

4.     In March 2023, BLM approved the Willow Project—the largest oil and gas development in the Reserve—on the express condition that it would "fully offset" impacts on the Herd through Mitigation Measure 27 (MM27), which required "durable, long-term protection" focused on "restricting future leasing or surface development" near Teshekpuk Lake. BLM implemented that commitment through the Right of Way, issued December 17, 2024, which presumptively prohibited new leasing on approximately one million acres of the Herd's most important habitat.

5.     On December 19, 2025, the Department of the Interior cancelled the Right of Way, asserting it was "obligated to include" these lands for potential leasing under Public Law 119-21, the Budget Reconciliation Act. Three days later, BLM issued the 2025 IAP, adopting the 2020 IAP's framework and opening approximately 18.6 million acres—more than 82 percent of the Reserve—to oil and gas leasing. This was nearly the entire TLSA, except for two small areas that would be deferred for 10 years. On February 11, 2026, BLM noticed a lease sale offering more than 600 tracts covering approximately 5.5 million acres, including core areas of the TLSA that have never been offered for lease and have been closed to leasing for most of the last four decades, as well as leases surrounding this area that have not been offered since 2012.

2

6.     BLM's actions rest on a foundational legal error. The Budget Reconciliation Act establishes minimum acreage floors and leasing parameters, but it does not dictate which parcels must be offered, displace the Reserves Act's conservation mandates, or eliminate the Secretary's longstanding authority to withhold lands from leasing. BLM treated the leasing decision as predetermined, never asked whether the Reserves Act independently constrained it, and never evaluated whether maximum protection of the TLSA required withholding specific lands or imposing protections beyond the 2020 IAP's general stipulations—stipulations BLM itself had previously found insufficient.

7.     That legal error produced cascading failures. BLM eliminated the Right of Way without replacing its protections or supplementing its environmental analysis. It opened tracts of land south and west of the former conservation area that are at risk of seismic exploration and drilling and overlap with caribou calving grounds, summer and winter range, and migration corridors without evaluating their ecological significance. It used a legally void plan, the 2022 IAP invalidated by Congress under Congressional Review Act (CRA), as its no-action alternative for the environmental assessment (EA) required by the National Environmental Policy Act (NEPA), producing an EA that compared the proposed action against a legal nullity. And it reversed its own factual findings about the inadequacy of stipulations without a word of explanation.

8.     BLM's actions violate the Administrative Procedure Act (APA) several times over. An agency must provide a reasoned explanation for its action, and an agency that reverses factual findings underlying a prior policy must provide a more detailed justification. *FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009). An agency that possesses discretion must recognize that discretion and explain how and why it exercised that discretion in the way that it did. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983). BLM complied

with none of these requirements. Plaintiffs seek, among other relief, vacatur of the Record of Decision (ROD) for the Integrated Activity Plan (2025 IAP) for the National Petroleum Reserve in Alaska (Reserve) and of the February 11, 2026 Notice of Sale (2026 lease sale) offering leases; and an injunction preventing BLM from approving ground-disturbing activity on tracts within and south and west of the former Right of Way that BLM has classified as having high oil and gas development potential, and any leases issued on those tracts.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the laws of the United States. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other appropriate relief pursuant to 28 U.S.C. §§ 2201–02, 5 U.S.C. §§ 704–06, and its inherent authority.

10.     Venue is proper under 28 U.S.C. § 1391(e)(1) because this action seeks relief against federal agencies and officials acting in their official capacities, at least one defendant is located in this district, and a substantial part of the events giving rise to the claims occurred in this district.

## PARTIES

11.     Plaintiff Grandmothers Growing Goodness (GGG) is a private, not-for-profit organization based in Nuiqsut, Alaska. GGG's mission is to protect the Reserve's subsistence resources, cultural heritage, and the health and safety of Iñupiat communities. GGG's members depend on the Reserve for subsistence hunting, traditional cultural practices, and their physical well-being—interests directly threatened by oil and gas activity in the TLSA and surrounding lands.

4

12.    Plaintiff The Wilderness Society (TWS) is a national, non-profit membership conservation organization headquartered in Washington, D.C. TWS is devoted to uniting people to protect the nation's wild places, including protecting the wilderness character, wildlife habitat, and natural values of wild places like the Reserve. TWS's members rely on the Reserve for recreation, scientific research, wildlife viewing, photography, and aesthetic and professional pursuits that industrial development in the TLSA would impair.

13.    Members of both organizations use and enjoy the Reserve, including areas affected by the 2025 IAP and the 2026 lease sale. They will be directly adversely affected and irreparably injured by the actions challenged in this complaint. Plaintiffs and their respective members also have a substantial interest in ensuring that BLM complies with federal law, including the procedural requirements of the NEPA, the APA, and the Reserves Act. Plaintiffs' injuries are actual and concrete and would be remedied by the relief sought in this case. An order vacating the 2025 ROD would eliminate the decisional basis for the lease sale; an order vacating the Notice of Sale would independently eliminate BLM's parcel-selection decision; and an order setting aside any issued leases would unwind the third-party rights themselves. *See Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560–61 (1992).

14.    Plaintiffs have submitted comments to BLM on the 2025 EA, the 2025 call for lease sale nominations, and other relevant agency proceedings. Each monitors the use of public lands in the Reserve, educates its members about management decisions, and advocates for policies that protect the Reserve's natural and cultural values.

15.    Defendant Doug Burgum is the Secretary of the United States Department of the Interior. He is sued in his official capacity.

5

16. Defendant Katharine MacGregor is the Deputy Secretary of the United States Department of the Interior and signatory of the Right of Way cancellation decision. She is sued in her official capacity.

17. Defendant the United States Department of the Interior is the executive department with overall responsibility for administering the Reserves Act. The Department of the Interior is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

18. Defendant Bill Groffy is the Acting Director of BLM. He is sued in his official capacity.

19. Defendant Kevin Pendergast is the Alaska State Director of BLM. He is sued in his official capacity.

20. Defendant United States Bureau of Land Management is the agency within the Department of the Interior with primary responsibility for managing the Reserve. BLM is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

## STATUTORY AND REGULATORY FRAMEWORK

### A. The Naval Petroleum Reserves Production Act

21. Congress enacted the Reserves Act in 1976, to govern oil and gas development in the Reserve. *See* 42 U.S.C. §§ 6501–6508. The statute establishes a dual mandate requiring oil and gas leasing while imposing binding conservation constraints. *N. Alaska Env't Ctr. v. U.S. Dep't of Interior*, 983 F.3d 1077, 1081 (9th Cir. 2020).

22. The Reserves Act directs the Secretary to conduct "an expeditious program of competitive leasing of oil and gas in the reserve." 42 U.S.C. § 6506a(a). This directive establishes a general leasing obligation but does not dictate which specific parcels must be offered in any particular sale.

6

23.     Congress imposed heightened protection requirements for designated special areas. Activities in those areas "shall be conducted in a manner which will assure the maximum protection of such surface values to the extent consistent with the requirements of this Act for the exploration of the reserve." 42 U.S.C. § 6504(a). The statute uses mandatory language ("shall") and a superlative standard ("maximum"). Congress specifically identified the Teshekpuk Lake area as requiring maximum protection. *Id.*

24.     Congress further required that authorized activities "shall include or provide for such conditions, restrictions, and prohibitions as the Secretary deems necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects on the surface resources." 42 U.S.C. § 6506a(b) (emphasis added). By expressly authorizing "prohibitions," Congress confirmed that the Secretary may bar leasing or development where necessary to protect surface values.

25.     "The task of balancing these directives falls to the Bureau of Land Management." *Ctr. for Biological Diversity v. Bur. of Land Mgmt.*, 141 F.4th 976, 989 (9th Cir. 2025).

26.     The Secretary is also authorized to "grant such rights-of-way, licenses, and permits as may be necessary to carry out his responsibilities under this Act." 42 U.S.C. § 6502. Those responsibilities encompass the "protection of environmental, fish and wildlife, and historical or scenic values" within the Reserve. *Id.* § 6503(b).

## B.     The Budget Reconciliation Act

27.     On July 4, 2025, Congress enacted the Budget Reconciliation Act, Pub. L. No. 119-21 (Reconciliation Act). Section 50105 directs the Secretary to conduct at least five lease sales within ten years, each offering at least four million acres, with the first sale by July 4, 2026. Sales are to be held "in the areas designated for oil and gas leasing as described in" BLM's 2020

Environmental Impact Statement (EIS) and record of decision. Pub. L. No. 119-21, § 50105(c), 139 Stat. 143–44.

28.     The Reconciliation Act makes no changes to the Reserves Act's conservation mandates. It does not repeal or amend the maximum-protection requirement for special areas, does not eliminate the Secretary's authority to impose prohibitions, and does not direct that any particular parcel be offered for lease.

29.     The House-reported version of H.R. 1 contained three provisions for the Reserve that do not appear in the enacted statute. Section 80122 directed BLM to "restore and resume" its competitive leasing program, directed BLM to "cease to implement, administer, or enforce" the Special Areas regulations at 43 C.F.R. pt. 2360, and declared the 2020 EIS to "fulfill the requirements of" NEPA for all mandated lease sales. Congress removed all three provisions before enactment.

30.     The enacted Section 50105 retains only reference language incorporating the 2020 documents' "lease form, lease terms, economic conditions, and stipulations." Pub. L. No. 119-21, §§ 50105(b), (d). Congress took the same approach to the companion Arctic Refuge provision: the House-reported version directed the Secretary to "reinstate" the 2020 Coastal Plain ROD; the enacted Section 50104 directs leasing on "the same terms and conditions as contained in" that document. *Id.* § 50104(b)(2).

## C.     The National Environmental Policy Act

31.     NEPA requires agencies to take a "hard look" at environmental consequences before committing to a course of action. *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983). For "major Federal actions significantly affecting the quality of the human environment," NEPA requires an environmental impact statement (EIS). 42 U.S.C. § 4332(C). When significance

is uncertain, an EA must take a hard look at impacts and consider reasonable alternatives, resulting either in a "finding of no significant impact" (FONSI) or a finding that an EIS is required. *Grand Canyon Trust v. FAA*, 290 F.3d 339, 340–41, 345–46 (D.C. Cir. 2002). NEPA requires supplementation when significant new circumstances arise. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989); *see* 42 U.S.C. § 4336(b)(1).

**D.     The Administrative Procedure Act**

32.     Under the APA, a court must "hold unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or adopted "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). An agency action is arbitrary if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or the decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. Where an agency reverses a prior policy, it must "show that there are good reasons for the new policy" and provide a "more detailed justification" if the new policy "rests upon factual findings that contradict those which underlay its prior policy." *Fox Television*, 556 U.S. at 515.

**FACTUAL ALLEGATIONS**

**A.     The Reserve and Its Ecological and Subsistence Values**

33.     The Reserve encompasses approximately 23 million acres of Arctic tundra, wetlands, lakes, and coastal habitat on Alaska's North Slope. Originally designated as Naval Petroleum Reserve No. 4 in 1923, it was transferred to the Department of the Interior in 1976 under the Reserves Act. Pub. L. No. 94-258, §§ 102–103, 90 Stat. 303.

9

34.     Native communities in northern Alaska have depended on the Reserve's natural resources for subsistence across thousands of years of continuous occupation. Hunting, fishing, and communal sharing of resources are key components of Iñupiat culture: the Iñupiat people's physical and cultural survival depends on the continued harvest of natural resources. Activities associated with subsistence—processing, sharing, cooperative hunting, fishing, whaling, gathering, and ceremonial activities—strengthen community bonds, reinforce cultural identity, and link contemporary Alaska Natives with their ancestors.

35.     Alaska Natives residing in Nuiqsut feel a deep connection to the land around Teshekpuk Lake and the Colville River. Community members are subsistence hunters who hunt and fish to feed themselves, their parents, and their children. These practices are vital given difficulties importing food to the region and the potential for food insecurity. In Nuiqsut, approximately 38 percent of household heads report difficulty obtaining enough healthy food, 53 percent cannot obtain sufficient subsistence foods, and 25 percent report times when household members do not have enough to eat.

36.     Congress recognized the overwhelming importance of subsistence uses in the Alaska National Interest Lands Conservation Act, declaring that "the continuation of the opportunity for subsistence uses by rural residents of Alaska . . . is essential to Native physical, economic, traditional, and cultural existence." 16 U.S.C. § 3111(1).

**B.      The Teshekpuk Caribou Herd**

37.     The Teshekpuk Caribou Herd (Herd) is one of four major caribou herds on the North Slope and is of particular importance to Iñupiat cultural heritage. Communities surrounding Teshekpuk Lake, including Nuiqsut, depend on the Herd for subsistence food, clothing, and other

10

commodities. Smaller herds such as the Herd are more vulnerable to the added pressures of development.

38. The high-density calving area extends beyond the Right of Way and includes tracts offered in the February 2026 sale. Pregnant females concentrate in meadow and wetland areas immediately surrounding the lake. BLM has found that if females are pushed from their current calving area, they "would be unlikely to find similar areas elsewhere across their range," and that "the magnitude of the negative consequences resulting from calving displacement is unknown but potentially large."

39. After calving, the Herd moves north to the Beaufort Sea coast to escape insects. Eighty-six percent of collared caribou moved through the Smith Bay and Kogru Inlet corridors within two weeks of calving. Thirty-five percent transit the constricted zone west of Teshekpuk Lake—the only western route between calving grounds and coastal insect-relief habitat. Free movement along this north-south axis is essential to the Herd's adaptation to annual variations in forage and insect conditions.

40. Fall and spring migrations pass through lands south of the TLSA, through TLSA lands south and west of the former Right of Way, and into the former Right of Way area—crossing multiple tracts offered in the February 2026 sale. Winter caribou survive on stored body fat, and disturbances force them to burn energy they cannot afford. Caribou avoid human activity more strongly in winter than in any other season, effectively shrinking their usable range wherever development is nearby. Roads within migration corridors cause documented delays: approximately 30 percent of collared female caribou approaching an industrial road south of the Reserve during fall migration experienced long delays averaging 33 days compared to 3 days for caribou that crossed without delay.

41.     Arctic caribou herds depend on large, connected landscapes. Roads, pipelines, and gravel pads fragment these landscapes and reduce the herds' ability to move between areas they need at different times of year. Decades of monitoring show avoidance of oil and gas infrastructure, with no sign of habituation.

## C.     BLM's History of Protecting the TLSA from Leasing

42.     BLM has managed leasing in the Reserve through successive Integrated Activity Plans (IAPs). The agency's first IAP, in 1998, deferred leasing around Teshekpuk Lake. In 2008, BLM issued a supplement to the 1998 plan, deferring leasing on approximately 430,000 acres near the lake for at least ten years. The 2013 IAP closed approximately half the Reserve to leasing, including most of the TLSA, noting that "some of these lands have been unavailable or deferred from leasing in every planning decision made by BLM for this part of the [Reserve] since 1983." The 2020 IAP reversed course, making nearly all the TLSA available. The 2020 EIS states that BLM may use "a phased approach" in which "the first sale, and any subsequent sale, might offer only a portion of the lands identified in the [record of decision] as available." The 2022 IAP returned to the 2013 framework, closing approximately 1.1 million acres around Teshekpuk Lake to both leasing and infrastructure.

43.     The 2022 IAP found that the 2020 IAP's approach of making TLSA lands "available to fluid mineral leasing, although subject to no surface occupancy or timing limitations," was insufficient to protect significant surface values. BLM determined that closing lands to both leasing and new infrastructure was necessary to protect areas "most heavily used by calving caribou and molting geese."

**D.     The Willow Project and Mitigation Measure 27**

44.     In March 2023, BLM approved the Willow Project—the largest oil and gas project in the Reserve. After the District Court for the District of Alaska vacated BLM's initial approval for failure to provide maximum protection to the TLSA, *Sovereign Iñupiat for a Living Arctic v. BLM*, 555 F. Supp. 3d 739, 805 (D. Alaska 2021), BLM developed a supplemental EIS that focused on subsistence uses and proposed measures to protect the Herd.

45.     The 2023 Willow Record of Decision included MM27, which required BLM to "develop compensatory mitigation that provides durable, long-term protection for the Herd to fully offset impacts of the project on that Herd . . . with a focus on restricting future leasing or surface development." MM27 was not advisory. It was the mechanism by which BLM determined that Willow's impacts could be lawfully approved. Courts upheld BLM's Willow approval after favorably citing MM27. *See Sovereign Iñupiat for a Living Arctic v. BLM*, 701 F. Supp. 3d 862, 896 (D. Alaska 2023); *Ctr. for Biological Diversity*, 141 F.4th at 1002, 1015.

46.     BLM's Protection Options Report, required by MM27, concluded that the minimum criterion for the TLSA was a restriction of future leasing and/or infrastructure, because closing a large portion of the Herd's habitat would reduce habitat loss, fragmentation, and interference with natural behavior. BLM implemented MM27 through the Right of Way, issued December 17, 2024, to Nuiqsut Trilateral, Inc., a nonprofit formed by Nuiqsut's city government, tribe, and village corporation. The Right of Way prohibited new leasing, exploration, and development on approximately one million acres within the TLSA for the duration of the Willow Project.

### E. The Joint Resolution under the Congressional Review Act

47.    On December 5, 2025, the President signed a joint resolution under the Congressional Review Act disapproving the 2022 NPR-A IAP/ROD. Pub. L. No. 119-47. Under the CRA, the 2022 plan is "treated as though it had never taken effect." 5 U.S.C. § 801(f).

### F.    The Cancellation of the Right of Way

48.    On December 19, 2025, the Deputy Secretary cancelled the Right of Way, asserting it had been "improperly issued" and that BLM was "obligated to include the area covered by the Right of Way within those areas available for potential leasing in accordance with Section 50105 Public Law 119-21." *See Nuiqsut Trilateral, Inc. v. Burgum*, 1:26-cv-239, ECF No. 1-2 at 10 (Jan 28, 2026) (Cancellation Letter). In cancelling the Right of Way, the Deputy Secretary stated that companies were "looking to conduct exploration activities in the area covered by the [Right of Way] this winter," that failure to cancel "could frustrate various planned and anticipated oil and gas development activities," and that "expeditious cancellation is necessary to ensure these activities can proceed without delay." *Id.* Although the cancellation letter stated that it would ensure that the issues addressed in MM27 are "appropriately addressed going forward," *id.*, no substitute protections have been provided.

49.    Nuiqsut Trilateral, Inc. filed suit on January 28, 2026, challenging the cancellation. *See Nuiqsut Trilateral, Inc. v. Burgum*, No. 1:26-cv-239 (D.D.C.). That litigation is pending and the Right of Way remains nullified.

### G.    The 2025 IAP

50.    On December 22, 2025, the BLM issued the 2025 IAP. The new IAP selected Alternative E from the 2020 EIS and opened approximately 18.6 million acres—more than 82

percent of the Reserve—to oil and gas leasing. The 2025 IAP opens the entirety of the TLSA to leasing, with only 132,000 acres deferred for ten years.

51.     Under the 2020 IAP, the TLSA was nominally open to leasing. However, the Right of Way, which was issued independently under 42 U.S.C. § 6502 to implement Willow Mitigation Measure 27, imposed a binding no-leasing prohibition on approximately one million of those acres. The 2025 IAP presupposes the cancellation of that restriction and treats those lands as unencumbered.

52.     BLM prepared a tiered EA that purported to incorporate new information since the 2020 EIS. The EA stated that the 2020 EIS and the 2025 EA together are intended to satisfy NEPA for lease sales through at least 2045. The EA did not consider any alternative other than the proposed action (full adoption of the 2020 IAP framework) and a no-action alternative based on the CRA-disapproved 2022 IAP—a plan that is legally void and "treated as though it had never taken effect." 5 U.S.C. § 801(f).

53.     The 2025 IAP Record of Decision characterizes the Reserves Act as a "dominant-use statute." The Reserves Act requires that activities within special areas "shall be conducted in a manner which will assure the maximum protection of such surface values to the extent consistent with the requirements of this Act for the exploration of the reserve." 42 U.S.C. § 6504(a). The 2025 IAP does not explain how the "dominant-use" characterization can be reconciled with  the maximum-protection standard for the TLSA.

54.     The EA said nothing about the creation and cancellation of the Right of Way, in which BLM itself determined that a no-leasing zone was necessary. The EA did not address updated data on caribou population declines, behavioral displacement from industrial operations,

15

or the severity of impacts from winter seismic activities. The EA acknowledged this information but dismissed all of it as insignificant without explanation.

55. Although the 2020 IAP designated TLSA lands as available for leasing, BLM never offered TLSA core lands at a lease sale during the five years that plan was operative. The February 2026 sale is the first time these tracts have been noticed for competitive bidding.

56. BLM's FONNSI, styled as a "finding of no new significant impact," declared the proposed action would have "no effect" on the environment because it asserts that the action made no material change from the 2020 plan. Yet the record of decision simultaneously asserts that the 2025 IAP "increases the area available for leasing by approximately 6.8 million acres," including "more land in the Teshekpuk Lake Special Area." Additionally, when approving seismic and exploration plans in the area during winter 2025–2026, BLM identified the implementation of the 2025 IAP as among the "significan[t] programmatic changes" affecting its analysis.

## H. The 2026 Lease Sale

57. On February 11, 2026, BLM noticed a lease sale offering more than 600 tracts covering approximately 5.5 million acres, including tracts within the cancelled Right of Way and the broader TLSA. 91 Fed. Reg. 6248. The sale includes core areas of the TLSA that have never been offered for lease and that have been entirely closed to leasing for most of the last four decades.

58. Neither the Notice of Sale nor the Statement of Sale provides any rationale for BLM's choice of tracts for sale, acknowledges the agency's prior findings that these lands should remain closed, or explains how offering them is consistent with the Reserves Act's conservation mandates.

59. The lease sale's deferral areas run east-west, perpendicular to the Herd's documented north-south migration axis between calving grounds and the Beaufort coast. Because

leased tracts are available both north and south of each deferred strip, the deferrals do not create a continuous corridor for free passage of the Herd.

60. Tracts south and west of the former Right of Way boundary overlap with documented caribou calving grounds, summer and winter range, and spring and fall migration corridors. These tracts fall within a zone BLM has classified as having high oil and gas development potential. They are adjacent to or near existing lease blocks held by active operators, including Santos and Armstrong Oil & Gas, both of which have expressed interest in expanding operations into these areas.

61. On January 16, 2025, BLM published an analysis of the Reserve's special areas in a BLM memorandum entitled "BLM Interim Management of Special Areas within the National Petroleum Reserve – Alaska." The analysis found that "additional significant resource values . . . require additional protection" and that proposed expansions "merit further evaluation for designation and additional protection." Months later, the 2025 IAP reversed course entirely—reopening to leasing the very lands BLM had determined needed greater protection.

I. **Impacts of Oil and Gas Activity on the Herd, Subsistence and Use of the Reserve**

62. BLM has found that caribou—particularly pregnant females and mothers with young calves—consistently avoid oil and gas infrastructure during calving, summer insect-relief periods, and fall migration, with no sign of habituation across more than 40 years of development. Helicopters, small planes, seismic testing vehicles, and industrial traffic push caribou away from feeding, calving, and insect-relief areas.

63. Nuiqsut hunters and elders have observed that caribou are already staying away from industrial activity and avoiding roads near the village. Hunters are forced to travel hundreds of miles to find animals once plentiful nearby. Caribou harvest restrictions have been imposed

across the North Slope—an unprecedented development. BLM has found that cumulative effects of development on subsistence "may be highly adverse and would be disproportionately borne by populations from Nuiqsut, Utqiaġvik, Anaktuvuk Pass, Atqasuk, Point Lay, and Wainwright." Bur. of Land Mgmt., *Record of Decision for the Willow Master Development Plan* at 22 (Mar. 2023) *available at* https://perma.cc/XF8K-KR38.

64. Subsistence is not simply food procurement. It is the mechanism through which Iñupiat cultural transmission occurs—young people learning hunting, safe travel, meat processing, and oral traditions at family camps. When those camps are surrounded by industrial activity, the chain of teaching is broken. This cultural loss cannot be remedied by money damages or later judicial decree.

65. GGG's members include Nuiqsut families who hunt caribou in areas the 2026 sale would open to exploration. For instance, GGG's Executive Director, Rosemary Ahtuangaruak, has experienced firsthand how helicopter overflights drive caribou from traditional hunting areas and endanger hunters on the ground. Her family's traditional hunting camp near existing infrastructure became increasingly undesirable as industrial activity expanded, caribou stopped coming through, and hunters had to travel farther to find animals. Her son stopped hunting for years after a helicopter scattered caribou during a harvest. If leases are issued in the TLSA and operators begin exploration, the same pattern will extend into lands her family and community still depend on for food.

66. The TLSA supports professional wilderness guides, photographers, filmmakers, and scientists who depend on the area's undisturbed character. Guides operate multi-day expeditions marketing the Reserve's remoteness and wildlife abundance; photographers and filmmakers depend on predictable wildlife behavior and the absence of industrial noise. Oil and

gas exploration degrades these values in ways that persist well beyond any individual operation—vehicle tracks scar tundra for decades, helicopter overflights displace wildlife, and the experiential character of the landscape is fundamentally altered.

67.     TWS's members include professional guides who lead trips in the TLSA and former Right of Way area, wildlife photographers and filmmakers who work there, and individuals who visit for recreation and scientific study. These members chose the Reserve because it is one of the last places in Arctic Alaska without industrial activity, and clients book trips to see caribou, nesting birds, and open tundra undisturbed by machinery. If leases are issued and operators begin helicopter reconnaissance and seismic surveys, the wildlife these members travel to observe will be displaced, industrial noise will replace the silence their clients and audiences expect, and vehicle tracks will scar terrain that takes decades to recover. Guides whose businesses depend on marketing an untouched landscape will lose the product they sell. Filmmakers documenting undisturbed Arctic ecosystems will lose their subject.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
*Violation of the APA—Arbitrary and Capricious*

68.     Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

69.     The Teshekpuk Lake Conservation Right of Way (Right of Way) cancellation, the 2025 Record of Decision (ROD) for the Integrated Activity Plan (2025 IAP) for the National Petroleum Reserve in Alaska (Reserve); and the February 11, 2026 Notice of Sale offering leases on tracts within the former Right of Way and tracts south and west of the former Right of Way that BLM has classified as having high oil and gas development potential (the 2026 lease sale) are final agency actions reviewable under the APA, 5 U.S.C. §§ 702, 704.

19

70.     Under the APA, a reviewing court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

71.     BLM interpreted the Budget Reconciliation Act as foreclosing the Secretary's longstanding discretion under the Reserves Act to withhold lands from leasing or impose prohibitions to protect surface values. In the Right of Way cancellation, BLM asserted it was "obligated to include" the Right of Way lands for potential leasing under Section 50105 of the Budget Reconciliation Act. In the 2025 EA, BLM described opening the TLSA as "consistent" with the Reconciliation Act and declined to consider any alternative.

72.     The Reconciliation Act does not displace the Reserves Act. Section 50105 specifies minimum acreage, timing, and lease terms. It does not address which parcels must be included, whether special area protections continue to apply, or whether the Secretary retains authority to impose prohibitions. BLM can meet the four-million-acre minimum from the Reserve's 18-million-plus acres outside the most sensitive portions of the TLSA. "In the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable." *Morton v. Mancari*, 417 U.S. 535, 550 (1974). The statutes readily coexist.

73.     *Under Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 392 (2024), this Court exercises independent judgment on the best reading of the statute.

74.     Because BLM carried out the Right of Way Cancellation, the 2025 IAP, and the decision to hold the 2026 lease sale under a mistaken view of the law, BLM's interpretation must be declared unlawful and the 2025 IAP and the decision to hold the 2026 lease sale must be set aside. *Department of Homeland Security v. Regents of the University of California*, 591 U.S. 1, 24

(2020); *Prill v. NLRB*, 755 F.2d 941, 947, 956-57 (D.C. Cir. 1985); *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943).

75.     BLM's actions are also arbitrary and capricious because BLM did not provide reasoned explanations for the actions, considered factors that Congress did not permit the agency to weigh and did not consider the facts that Congress directed the agency to consider, failed to consider reasonable alternatives, and did not acknowledge its change in positions or consider the serious reliance interests jeopardized by its actions.

76.     For instance, BLM approved the Willow Project on the express condition that it would fully offset impacts on the Herd through MM27, focused on restricting future leasing and/or development. The Protection Options Report, which considered how to implement MM27, confirmed that leasing and/or infrastructure restrictions were the minimum criterion. The Right of Way implemented that commitment. The 2025 IAP eliminates the Right of Way's protections and reverts to the 2020 IAP's general lease stipulations for the same lands without any explanation of how stipulations—which do not restrict leasing itself—achieve the level of protection that BLM previously determined required a leasing prohibition.

77.     BLM has not addressed what becomes of the MM27 obligation. The Willow ROD has not been amended. The Right of Way cancellation committed to ensuring MM27's issues are "appropriately addressed going forward." No substitute has been identified—yet BLM is now offering for lease the very lands it committed to protect.

78.     BLM's reversal directly contradicts the agency's own prior findings. The 2022 IAP found the 2020 IAP's stipulations-only approach insufficient to protect the TLSA. Lands within the TLSA's core had been closed or deferred from leasing in every BLM planning decision since

1983. BLM has provided no explanation for abandoning a four-decade consensus, spanning multiple administrations, that general lease stipulations were insufficient.

79.     BLM also failed to evaluate whether high-value tracts south and west of the former Right of Way boundary should be withheld or subjected to additional protections. These tracts overlap documented caribou calving habitat, summer and winter range, and spring and fall migration, fall within high oil-development-potential zones, and are adjacent to existing operator leases. BLM's own January 2025 analysis found these lands merited additional protection. BLM's failure to evaluate these questions means it "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43.

80.     Where an agency reverses factual findings underlying a prior policy, it must provide a "more detailed justification." *Fox Television*, 556 U.S. at 515. BLM provided no justification. The 2025 IAP is arbitrary and capricious on this basis alone and must be set aside.

## SECOND CLAIM FOR RELIEF
### *Violation of the APA: Contrary to the Reserves Act*

81.     Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

82.     The Reserves Act requires that activities within the TLSA "shall be conducted in a manner which will assure the maximum protection of such surface values." 42 U.S.C. § 6504(a). BLM has discretion to select among protective measures, but it does not have discretion to dispense with the obligation altogether.

83.     BLM's decision to lease the TLSA—including core areas closed to leasing for four decades—without determining whether the Reserves Act's maximum-protection mandate required withholding these lands or imposing protections beyond the 2020 IAP's general stipulations violates the statute. BLM inverted the statutory framework by starting from the premise that

leasing was required and asking only whether existing stipulations were "consistent" with that decision, rather than starting from what maximum protection of the Herd's calving and insect-relief habitat requires and evaluating whether leasing with 2020-era stipulations satisfies that standard.

84.     Neither the 2025 IAP, the 2025 EA, nor the Notice of Sale explains how offering previously closed TLSA lands for lease is consistent with maximum protection. BLM's failure to consider or demonstrate compliance with its statutory mandate is contrary to law and must be set aside. 5 U.S.C. § 706(2)(A).

## THIRD CLAIM FOR RELIEF
### *Violation of the APA: Contrary to NEPA*
### *(Deficient Environmental Analysis)*

85.     Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

86.     A court must set aside agency action that is "not in accordance with law" or that is taken "without observance of procedure required by law." 5 U.S.C. §§ 706(2)(A), (D). NEPA requires agencies to take a hard look at environmental consequences before committing to action and to consider a reasonable range of alternatives. 42 U.S.C. § 4332(C).

87.     The 2025 EA is deficient in at least four independent respects, each of which independently requires vacatur.

88.     **First**, BLM used a legally void plan as its no-action alternative. Congress disapproved the 2022 IAP under the CRA, rendering it "as though [it] had never taken effect." 5 U.S.C. § 801(f); *see* Pub. L. No. 119-47. The actual status quo is the 2020 IAP, which is also the action alternative. The EA thus contains no genuine alternative at all. BLM admitted it used the 2022 plan because the analysis was "already largely complete." NEPA's no-action alternative must

describe real-world conditions absent the proposed action, *Young v. Gen. Servs. Admin.*, 99 F. Supp. 2d 59, 74–75 (D.D.C. 2000), not a nullity selected for analytical convenience.

89.     **Second**, the FONNSI is internally contradictory. BLM declared the proposed action would have no effect because it makes no material change from the 2020 plan, while simultaneously asserting that the 2025 IAP increases the area available for leasing by approximately 6.8 million acres. BLM cannot claim in one document that nothing changes and in others that it is opening millions of acres. This contradiction is a direct consequence of the manufactured baseline. *See Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008).

90.     The 2025 EA's deficiencies independently and collectively violate NEPA and the APA. The EA and the FONNSI, and all decisions relying on them must be set aside. 5 U.S.C. §§ 706(2)(A), (D).

91.     **Third,** BLM selectively updated the record while omitting the most significant post-2020 change to the TLSA—the creation and cancellation of the Right of Way. The EA addressed climate projections and other developments but said nothing about BLM's own determination, never reversed by Congress, that a no-leasing zone was necessary. Nor did BLM address updated data on caribou population declines, behavioral displacement from industrial operations, or the severity of impacts from winter seismic activities. NEPA requires supplementation when significant new circumstances arise. *Marsh*, 490 U.S. at 371; *see* 42 U.S.C. § 4336(b)(1).

92.     **Fourth,** BLM's erroneous legal premise foreclosed a genuine alternatives analysis. By treating the Reconciliation Act as requiring wholesale adoption of the 2020 IAP's leasing allocations, BLM defined the decision space so narrowly that only one outcome was possible and declined to consider any other alternative for detailed analysis. An agency may not define the

objectives of its action so unreasonably narrowly that only one alternative survives. *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991). Had BLM correctly understood its discretion, it would have been required to evaluate alternatives that exercised it.

## FOURTH CLAIM FOR RELIEF
### Violation of the APA: Contrary to NEPA
### (Failure to Conduct Lease-Sale-Level NEPA Analysis)

93.     Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

94.     NEPA requires a thorough analysis whenever an agency makes an irretrievable commitment of resources, including a decision to sell leases. *Sierra Club v. Peterson*, 717 F.2d 1409, 1414 (D.C. Cir. 1983). Neither the 2020 EIS nor the 2025 EA analyzes alternatives to or impacts from individual lease sale decisions. Neither document discusses how BLM will decide whether, when, or where to offer tracts for sale.

95.     BLM noticed a lease sale offering more than 600 tracts across 5.5 million acres, including sensitive areas closed for decades. BLM did not prepare any site-specific environmental analysis, did not consider alternatives for the lease sale decision—including an alternative that would exclude tracts within the TLSA or other special areas—and did not assess the differential impacts of offering different configurations of tracts.

96.     BLM's failure to consider lease-sale-level alternatives or to assess the reasonably foreseeable environmental impacts of the 2026 lease sale violates NEPA, 42 U.S.C. § 4332(2), and the APA, 5 U.S.C. §§ 702, 706.

## PRAYER FOR RELIEF

NOW, THEREFORE, Plaintiffs request judgment in their favor against Defendants as follows:

A.    Declare that the Deputy Secretary's December 19, 2025 cancellation of the Teshekpuk Lake Conservation Right of Way is arbitrary and capricious, contrary to law, and in violation of the APA;

B.    Declare that the 2025 ROD and the February 2026 Notice of Sale are arbitrary and capricious, not in accordance with the Reserves Act and NEPA, and otherwise unlawful;

C.    Vacate and set aside the 2025 ROD;

D.    Vacate and set aside the February 2026 Notice of Sale insofar as it offers tracts within the former Right of Way and tracts south and west of the former Right of Way that BLM has classified as having high oil and gas development potential;

E.    Vacate and set aside any leases issued on those tracts;

F.    Enjoin BLM from approving ground-disturbing activity on those tracts pending final resolution of this case;

G.    Award Plaintiffs reasonable attorneys' fees and costs; and

H.    Grant such other and further relief as the Court may deem just and proper.

Dated: February 17, 2026

Respectfully submitted,

*/s/ Daniel F. Jacobson*
Daniel F. Jacobson (D.C. Bar # 1016621)
Nina Cahill (D.C. Bar No. 1735989)
JACOBSON LAWYERS GROUP PLLC
5100 Wisconsin Ave., Suite 301
Washington, DC 20016
(301) 823-1148
dan@jacobsonlawyersgroup.com

*Counsel for Plaintiff The Wilderness Society*

Layla A. Hughes[+] (D.C. Bar # 472948)
909 Goldbelt Ave.
Juneau, AK 99801
(386) 693-1963
laylahughes@laylahughes.com

[+] *Pro hac vice* application forthcoming

*Counsel for Plaintiffs*