**Have IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| GRANDMOTHERS GROWING GOODNESS, *et al.*,<br><br>　　　　　　Plaintiffs,<br>　　　v.<br><br>DOUG BURGUM, in his official capacity as Secretary of the Interior, *et al.*,<br><br>　　　　　　Defendants,<br><br>　　　and<br><br>CONOCOPHILLIPS ALASKA INC., *et al.*,<br><br>　　　　　　Intervenor-Defendants. | Case No. 3:26-cv-00097-SLG |

## <u>ORDER ON MOTION FOR PRELIMINARY INJUNCTION</u>

Before the Court at Docket 14 is Plaintiffs Grandmothers Growing Goodness and The Wilderness Society's Motion for Preliminary Injunction. Defendants Secretary of the Interior Doug Burgum, Deputy Secretary of the Interior Katharine MacGregor, the United States Department of the Interior (the "Department"), Acting Director of the Bureau of Land Management Bill Groffy, Alaska State Director of the Bureau of Land Management Kevin Pendergast, and the United States Bureau of Land Management ("BLM") (collectively, "Federal Defendants") and Intervenor-Defendant ConocoPhillips Alaska, Inc. ("ConocoPhillips") responded in opposition at Dockets 26 and 27, respectively. Plaintiffs replied at

Docket 42. Intervenor-Defendants North Slope Exploration, LLC and North Slope Energy, LLC joined the Federal Defendants' opposition at Docket 49. At the Court's request, the parties submitted supplemental briefing on the Ninth Circuit's legal standard for preliminary injunctions at Dockets 46, 47, and 48. Oral argument on the motion was held on March 12, 2026.

## BACKGROUND

The National Petroleum Reserve–Alaska ("NPR-A"), on Alaska's North Slope, consists of 23.6 million acres and is the nation's largest single unit of public land.[1] Established as the Naval Petroleum Reserve in 1923, the NPR-A was renamed and its management authority was transferred to the Secretary of the Interior in 1976 by the Naval Petroleum Reserves Production Act ("NPRPA"), 42 U.S.C. § 6501 *et seq.*[2] In 1980, the NPRPA was amended by an appropriations rider mandating that "[t]he Secretary [of the Interior] shall conduct an expeditious program of competitive leasing of oil and gas in the Reserve in accordance with this Act."[3] The NPRPA also directs the Secretary to "assume all responsibilities" for the "protection of environmental, fish and wildlife, and historical or scenic values."[4] To that end, the NPRPA requires that "[a]ctivities undertaken pursuant

---

[1] *N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969, 973 (9th Cir. 2006).

[2] H.R. Rep. No. 94-81, at 5-6, 8-9 (1975); Naval Petroleum Reserves Production Act, Pub. L. No. 94-258, 90 Stat. 303 (1976) (codified at 42 U.S.C. § 6503(a)).

[3] Pub. L. No. 96-514, 94 Stat. 2957, 2964 (1980) (codified at 42 U.S.C. § 6506a).

[4] 42 U.S.C. § 6503(b).

Case No. 3:26-cv-00097-SLG, *Grandmothers Growing Goodness, et al. v. Burgum, et al.*
Order on Motion for Preliminary Injunction
Page 2 of 20

to [the NPRPA] shall include or provide for such conditions, restrictions, and prohibitions as the Secretary deems necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects on the surface resources of the [NPR-A]."[5]

Certain lands within the NPR-A, including the Teshekpuk Lake Special Area ("TLSA"), have been designated as special areas and are subject to heightened protection under the NPRPA.[6] Specifically, the NPRPA provides that

> [a]ny exploration within the Utukok River, the Teshekpuk Lake areas, and other areas designated by the Secretary of the Interior containing any significant subsistence, recreational, fish and wildlife, or historical or scenic value, shall be conducted in a manner which will assure the maximum protection of such surface values to the extent consistent with the requirements of this Act for the exploration of the reserve.[7]

The TLSA consists of approximately 3.65 million acres within the NPR-A.[8]

BLM manages the NPR-A through Integrated Activity Plans ("IAPs"), which determine which lands are available for leasing and establish mitigation measures and stipulations governing development.[9] BLM then analyzes an IAP through an Environmental Impact Statement ("EIS"), then adopts the final IAP in a Record of

---

[5] *Id.* § 6506a(b).

[6] *Id.* § 6504(a).

[7] *Id.*

[8] Docket 14-21 (Right of Way) at 3.

[9] *See N. Alaska Env't Ctr.*, 457 F.3d at 973.

Case No. 3:26-cv-00097-SLG, *Grandmothers Growing Goodness, et al. v. Burgum, et al.*
Order on Motion for Preliminary Injunction
Page 3 of 20

Decision ("ROD").[10]  BLM has issued IAPs in the RODs in 2013, 2020, 2022, and 2025.

Earlier IAPs generally restricted development around the TLSA and large portions of the NPR-A[11]—most notably the 2013 IAP, which closed roughly half the NPR-A to leasing.[12]  The 2020 IAP significantly expanded leasing availability to about 18.6 million acres, including most of the TLSA,[13] but the 2022 IAP largely reverted to the more restrictive 2013 framework.[14]

In March 2023, BLM approved the Willow Master Development Plan, a large oil and gas project in the NPR-A.[15]  The Willow Master Development Plan included Mitigation Measure 27 ("MM27"), which provides in relevant part:

> BLM will develop compensatory mitigation that provides durable, long-term protection for the Teshekpuk Caribou Herd to fully offset impacts of the project on that Herd, to include protecting the surface area of Teshekpuk Lake, a buffer along all shores of the lake, and the K-10 Caribou Movement Corridors/K-16 Deferral Areas (under Alternative E in the 2020 National Petroleum Reserve in Alaska Integrated Activity Plan Final Environmental Impact Statement) using existing statutory, management or administrative authorities, with a focus on

---

[10] *See Nat'l Audubon Soc'y v. Haaland*, Case No. 3:20-cv-00206-SLG, 2023 WL 5984204, at *1 (D. Alaska Sept. 14, 2023).

[11] Designation of Additions to Special Areas in National Petroleum Reserve-Alaska, 64 Fed. Reg. 16747 (April 6, 1999); Northeast NPR-A Supp. IAP ROD, Bureau of Land Mgmt., U.S. Dep't of the Interior (July 2008).

[12] Docket 14-12 (2013 IAP ROD).

[13] Docket 14-15 (2020 IAP ROD).

[14] Docket 14-18 (2022 IAP ROD).

[15] Docket 14-19 (Willow SEIS ROD, excerpted) at 4-5.

Case No. 3:26-cv-00097-SLG, *Grandmothers Growing Goodness, et al. v. Burgum, et al.*
Order on Motion for Preliminary Injunction
Page 4 of 20

Case 3:26-cv-00097-SLG     Document 59     Filed 03/18/26     Page 4 of 20

restricting future leasing or surface development in those areas.[16]

To implement this requirement, in December 2024, BLM issued a conservation right-of-way ("ROW") encompassing approximately one million acres in the TLSA to Nuiqsut Trilateral, Inc., a nonprofit organization formed by Nuiqsut's city government, tribe, and village corporation.[17] The ROW allows Nuiqsut Trilateral to prohibit new oil and gas leasing and development on the ROW acreage, which is key habitat for the Teshekpuk Caribou Herd.[18] The ROW provides that it "shall continue and remain in effect throughout the life of construction and operation of the Willow Project."[19]

On July 4, 2025, Congress passed the One Big Beautiful Bill Act ("OBBBA"), which includes a provision that the Secretary "shall expeditiously restore and resume oil and gas lease sales under the Program" established in the NPR-A "for domestic energy production and Federal revenue in the areas designated for oil and gas leasing as described in" the 2020 IAP EIS and the 2020 IAP ROD.[20] The OBBBA specifically instructs the Secretary to "conduct not fewer than 4 lease sales area-wide under the oil and gas program by not later than 10 years after the date of enactment of this Act," each of which "shall offer not fewer than 4,000,000

---

[16] Docket 14-19 (Willow SEIS ROD, excerpted) at 4.

[17] Docket 14-21 (Right of Way) at 2-4.

[18] Docket 14-21 (Right of Way) at 3-4.

[19] Docket 14-21 at 4.

[20] Pub. L. No. 119-21, § 50105(a-b), 139 Stat. 72, 143.

Case No. 3:26-cv-00097-SLG, *Grandmothers Growing Goodness, et al. v. Burgum, et al.*
Order on Motion for Preliminary Injunction
Page 5 of 20

acres."[21]  The OBBBA does not contain any mention of the ROW.  More recently, on December 5, 2025, Congress, acting pursuant to the Congressional Review Act, nullified the 2022 IAD ROD.[22]

On December 19, 2025, the Department of the Interior delivered a "Right of Way Cancellation letter" ("ROW Cancellation Notice") to Nuiqsut Trilateral, which purported to immediately and unilaterally cancel the ROW.[23]  The ROW Cancellation Notice stated that the ROW was "at odds with the text and purpose of the NPRPA," constituted an improper sub-delegation of federal authority, and its cancellation was necessary to ensure compliance with the OBBBA.[24]  Shortly thereafter, on December 22, 2025, BLM issued the 2025 IAP opening approximately 18.6 million acres, or 82 percent, of the NPR-A to oil and gas leasing.[25]  "Of the 18.6 million acres, approximately 132,000 acres in the northeastern part of the [NPR-A in the TLSA] would not be available for leasing until ten years after [the 2025 IAP ROD was] signed, when a ten-year deferral established by [the 2025 IAP ROD] in the [TLSA] expires."[26]

---

[21] *Id.* § 50104(b), 139 Stat. 72, 142-43.

[22] 5 U.S.C. § 801(f); Pub. L. No. 119-47, 139 Stat. 696.

[23] Docket 14-22 (ROW Cancellation Notice) at 10.

[24] Docket 14-22 at 7-8.

[25] Docket 14-24 (2025 IAP ROD) at 4-5.

[26] Docket 14-24 at 5.

Case No. 3:26-cv-00097-SLG, *Grandmothers Growing Goodness, et al. v. Burgum, et al.*
Order on Motion for Preliminary Injunction
Page 6 of 20
Case 3:26-cv-00097-SLG   Document 59   Filed 03/18/26   Page 6 of 20

On February 11, 2026, BLM published a Notice of Intent to hold a lease sale on March 18, 2026 ("Notice of Sale") involving approximately 5.5 million acres of NPR-A, including tracts within the ROW.[27]

Plaintiffs initiated this action on February 17, 2026, challenging the lease sale, the ROW Cancellation Notice, and the 2025 IAP ROD under the Administrative Procedure Act ("APA").[28] Plaintiffs allege that the ROW Cancellation Notice, the 2025 IAP ROD, and the Notice of Sale were arbitrary and capricious, inconsistent with the NPRPA's mandate to ensure maximum protection of surface values within the NPR-A, and issued without the environmental analysis required by NEPA.[29] On February 20, 2026, Plaintiffs moved for preliminary injunctive relief asking the Court to enjoin BLM from holding lease sales on all tracts within the ROW and on additional tracts south and west of the ROW within the TLSA.[30]

On March 16, 2026, this Court issued a preliminary injunction in a related case, *Nuiqsut Trilateral, Inc. v. Burgum, et al.*, Case No. 3:26-cv-00098-SLG, staying the ROW Cancellation Notice and ordering that the December 2024 Right

---

[27] Docket 14-29 (Notice of Sale).

[28] Docket 1.

[29] Docket 1 at 20-26, ¶¶ 68-96.

[30] Docket 14.

Case No. 3:26-cv-00097-SLG, *Grandmothers Growing Goodness, et al. v. Burgum, et al.*
Order on Motion for Preliminary Injunction
Page 7 of 20

of Way issued to Nuiqsut Trilateral, Inc. shall remain in full force and effect during the pendency of that action.[31]

## JURISDICTION

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, which "confer[s] jurisdiction on federal courts to review agency action, regardless of whether the [Administrative Procedure Act, 5 U.S.C. §§ 701-706,] of its own force may serve as a jurisdictional predicate."[32]

## LEGAL STANDARD

In *Winter v. Natural Resources Defense Council, Inc.*, the United States Supreme Court held that plaintiffs seeking preliminary injunctive relief must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) a preliminary injunction is in the public interest.[33] When, as here, the government is a party to the action, the balance of equities factor and the public interest factor merge.[34] The Supreme Court in *Winter* characterized "injunctive relief as an extraordinary remedy that may only be

---

[31] *See Nuiqsut Trilateral, Inc. v. Burgum, et al.*, Case No. 3:26-cv-00098-SLG, 2026 WL 734749, at *9 (D. Alaska Mar. 16, 2026) (Order on Motion for Preliminary Injunction).

[32] *Califano v. Sanders*, 430 U.S. 99, 105 (1977).

[33] 555 U.S. 7, 20 (2008).

[34] *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

Case No. 3:26-cv-00097-SLG, *Grandmothers Growing Goodness, et al. v. Burgum, et al.*
Order on Motion for Preliminary Injunction
Page 8 of 20

Case 3:26-cv-00097-SLG    Document 59    Filed 03/18/26    Page 8 of 20

awarded upon a clear showing that the plaintiff is entitled to such relief."[35]

Following *Winter*, the Ninth Circuit addressed the first element—the likelihood of success on the merits—and held that its "serious questions" approach to preliminary injunctions was still valid "when applied as part of the four-element *Winter* test."[36]  Under that approach, if a plaintiff shows "that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips *sharply* in the plaintiff's favor.'"[37]  Serious questions "need not promise a certainty of success, nor even present a probability of success, but must involve a fair chance of success on the merits."[38]  All four *Winter* elements must still be satisfied under this approach.[39]

Injunctive relief is an equitable remedy, and "[t]he essence of equity jurisdiction is the power of the court to fashion a remedy depending upon the necessities of the particular case."[40]

---

[35] *Winter*, 555 U.S. at 22 (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)).

[36] *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–32 (9th Cir. 2011).

[37] *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 942 (9th Cir. 2014) (emphasis in original) (quoting *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013)).

[38] *Id.* (internal quotation marks omitted) (quoting *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (en banc)).

[39] *See All. for the Wild Rockies*, 632 F.3d at 1135 ("Of course, plaintiffs must also satisfy the other *Winter* factors.").

[40] *United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 175 (9th Cir. 1987).

Case No. 3:26-cv-00097-SLG, *Grandmothers Growing Goodness, et al. v. Burgum, et al.*
Order on Motion for Preliminary Injunction
Page 9 of 20

**DISCUSSION**

## I.    Final Agency Action

As a threshold issue, the Court considers ConocoPhillips's contention that the Court lacks jurisdiction to enjoin the lease sale notice because it is not a final agency decision.[41] ConocoPhillips asserts that the Notice of Sale merely initiates the bidding process and is only the first step in a multi-stage regulatory process.[42] Plaintiffs respond that the Notice of Sale represents the consummation of BLM's tract-selection process, which creates legal consequences for bidders and affected communities.[43] Plaintiffs also point to the ROW Cancellation Notice and the 2025 IAP ROD as independently reviewable agency actions.[44]

The APA permits judicial review of "final agency action for which there is no other adequate remedy in a court."[45] Agency action is final where the action "mark[s] the consummation of the agency's decisionmaking process . . . it must not be of a merely tentative or interlocutory nature" and "must be [an action] by which rights or obligations have been determined, or from which legal consequences will flow."[46] Agency action may be final even where the agency does not characterize

---

[41] Docket 27 at 21-23.

[42] Docket 27 at 22.

[43] Docket 42 at 6, 7-9.

[44] Docket 42 at 6, 8.

[45] 5 U.S.C. § 704.

[46] *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal citations and quotations omitted).

Case No. 3:26-cv-00097-SLG, *Grandmothers Growing Goodness, et al. v. Burgum, et al.*
Order on Motion for Preliminary Injunction
Page 10 of 20

it as such when "it 'has the status of law or comparable legal force' or if 'immediate compliance with its terms is expected.'"[47]

Here, this Court need not decide at this juncture whether the Notice of Sale constitutes a final agency decision, for the 2025 IAP ROD is clearly a reviewable agency action. The Court therefore has jurisdiction to review and enjoin a lease sale conducted pursuant to the 2025 IAP ROD. The ROW Cancellation Notice likewise constitutes a final agency action and is reviewable.[48]

## II.     Irreparable Harm

The Court first considers whether Plaintiffs have demonstrated that they are likely to suffer irreparable harm during the pendency of this case in the absence of preliminary injunctive relief. A plaintiff "must demonstrate that in the absence of a preliminary injunction, 'the [plaintiff] is likely to suffer irreparable harm before a decision on the merits can be rendered.'"[49] "A likelihood of irreparable harm means 'a likelihood of substantial and immediate irreparable injury.'"[50] The Supreme

---

[47] *Columbia Riverkeeper v. U.S. Coast Guard*, 761 F.3d 1084, 1095 (9th Cir. 2014) (quoting *Or. Natural Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 987 (9th Cir. 2006)).

[48] *See* Docket 14-22 at 10 ("My decision constitutes the final decision of the Department and, in accordance with 43 CFR § 4.402(b)(2), is not subject to appeal under Departmental regulations at 43 CFR Part 4.").

[49] *Winter*, 555 U.S. at 22 (quoting 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2948.1 (2d ed. 1995)).

[50] *Medcursor Inc. v. Shenzen KLM Internet Trading Co.*, 543 F. Supp. 3d 866, 877 (C.D. Cal. 2021) (quoting *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 678 F.3d 1314, 1325 (Fed. Cir. 2012)). *See also City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) ("The equitable remedy [of injunction] is unavailable absent a showing of irreparable injury, . . . a 'likelihood of substantial and immediate irreparable injury.'" (quoting *O'Shea v. Littleton*, 414 U.S. 488, 501 (1974))).

Case No. 3:26-cv-00097-SLG, *Grandmothers Growing Goodness, et al. v. Burgum, et al.*
Order on Motion for Preliminary Injunction
Page 11 of 20

Case 3:26-cv-00097-SLG     Document 59     Filed 03/18/26     Page 11 of 20

Court has emphasized that "simply showing some 'possibility of irreparable injury'" is insufficient.[51] "Speculative injury does not constitute irreparable injury . . . . [A] plaintiff must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief."[52] Moreover, the injury must be irreparable,[53] and "[t]here must be a 'sufficient causal connection' between the alleged irreparable harm and the activity to be enjoined," such as a "showing that 'the requested injunction would forestall' the irreparable harm."[54] The movant, "*by a clear showing*, carries the burden of persuasion."[55]

As a preliminary matter, Federal Defendants correctly note that a related case is currently pending before this Court—*Center for Biological Diversity v. Burgum*, Case No. 3:20-cv-00206-SLG.[56] That case also challenges the legality

---

[51] *Nken v. Holder*, 556 U.S. 418, 434–35 (2009) (quoting *Abbassi v. INS*, 143 F.3d 513, 514 (9th Cir. 1998)). As the Supreme Court has explained, "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22 (citing *Mazurek*, 520 U.S. at 972).

[52] Caribbean Marine Servs. Co., Inc. v. Baldridge, 844 F.2d 668, 674 (9th Cir. 1988) (emphasis omitted) (first citing Goldie's Bookstore, Inc. v. Superior Ct. of State of Cal., 739 F.2d 466, 472 (9th Cir. 1984); and then citing L.A. Mem'l Coliseum Comm'n v. Nat'l Football League, 634 F.2d 1197, 1201 (9th Cir. 1980)).

[53] *See L.A. Mem'l Coliseum Comm'n*, 634 F.2d at 1202 (holding that injury of lost revenues was not irreparable).

[54] *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 819 (9th Cir. 2018) (quoting *Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 981–82 (9th Cir. 2011)).

[55] *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (emphasis in original) (quoting *Mazurek*, 520 U.S. at 972).

[56] Docket 26 at 10-11 (citing *Center for Biological Diversity v. Burgum*, Case No. 3:20-cv-00206-SLG, 2023 WL 5984204, at *2-3 (D. Alaska Sept. 14, 2023)).

Case No. 3:26-cv-00097-SLG, *Grandmothers Growing Goodness, et al. v. Burgum, et al.*
Order on Motion for Preliminary Injunction
Page 12 of 20

of the 2025 IAP ROD.[57]  The schedule in that case requires the parties to complete merits briefing by July 2026.[58]  The parties have also jointly requested a decision from this Court by October 2026 and the Court has stated its intention to issue a decision on the legality of the 2025 IAP ROD within that timeframe.[59]  The Court intends to impose the same schedule on the parties in this case.

Some of the harms that Plaintiffs contend are immediate and irreparable will not occur, if at all, until after October 2026.  For example, Plaintiffs assert that winter exploration activities expected to follow lease issuance—including ice-road construction, seismic surveys, and drilling mobilization—could begin as early as winter 2026–27.[60]  Given the timing of these activities, these potential winter exploration activities cannot form the basis of a finding of likelihood of irreparable harm during the pendency of this case.

Plaintiffs do assert that certain immediate and irreparable harms will occur before October 2026.  According to Plaintiffs, oil and gas exploration in the NPR-A follows a fixed seasonal cycle and if leases are issued in March 2026, operators

---

[57] Third Amended and Supplemental Complaint for Declaratory and Injunctive Relief, *Center for Biological Diversity v. Burgum*, Case No. 3:20-cv-00206-SLG (D. Alaska Feb. 26, 2026), Docket 139.

[58] Order on Joint Motion for Scheduling Order, *Center for Biological Diversity v. Burgum*, Case No. 3:20-cv-00206-SLG (D. Alaska Mar. 2, 2026), Docket 140 at 2.

[59] Plaintiffs' and Federal Defendants' Joint Motion for Scheduling Order, *Center for Biological Diversity v. Burgum*, Case No. 3:20-cv-00206-SLG (D. Alaska Feb. 20, 2026), Docket 135 at 3-4.

[60] Docket 14-1 at 38-40.

Case No. 3:26-cv-00097-SLG, *Grandmothers Growing Goodness, et al. v. Burgum, et al.*
Order on Motion for Preliminary Injunction
Page 13 of 20
Case 3:26-cv-00097-SLG    Document 59    Filed 03/18/26    Page 13 of 20

will likely begin summer helicopter reconnaissance within weeks.[61] Plaintiffs highlight BLM's record identifying helicopter traffic as the most commonly reported impact on caribou hunting by Nuiqsut harvesters since subsistence monitoring began in 2009, explaining that helicopter activity scatters caribou during hunts and diverts them from traditional migration routes, particularly during the June through October hunting season.[62]  Plaintiffs also assert that helicopter reconnaissance involving "low-altitude flights" with "frequent takeoffs, landings, hovering, and circling" disrupts caribou movement and note that BLM's own documents discuss the adverse effects of helicopter activity on caribou.[63]

Plaintiffs rely on the declaration of Rosemary Ahtuangaruak, Executive Director of Plaintiff Grandmothers Growing Goodness, who states that frequent helicopter overflights near the Alpine oilfield have displaced caribou from areas used by her family and disrupted hunts, and that similar harms will occur this summer if leases are issued in the ROW and adjacent areas.[64]  According to Dr. Ahtuangaruak, "the Herd migrates through a narrow corridor between Teshekpuk Lake and the Kogru River,"[65] which is within the ROW, and "caribou cross [the land

---

[61] Docket 14-1 at 30 (citing Docket 14-17 at 5, 6).

[62] Docket 14-1 at 17 (citing Docket 14-17 at 9).

[63] Docket 14-1 at 30 (citing Docket 14-17 at 5, 6); Docket 55 at 2 (citing Docket 14-39 at 45).

[64] Docket 14-3 at 7-11, ¶¶ 13-19.

[65] Docket 14-3 at 9, ¶ 18.

Case No. 3:26-cv-00097-SLG, *Grandmothers Growing Goodness, et al. v. Burgum, et al.*
Order on Motion for Preliminary Injunction
Page 14 of 20

Case 3:26-cv-00097-SLG    Document 59    Filed 03/18/26    Page 14 of 20

south of the ROW] in spring to reach their calving grounds around Teshekpuk Lake, and [] cross again in fall heading south toward the Brooks Range foothills."[66] "If these tracts are leased and developed, the caribou will have no unobstructed path between their wintering grounds and their calving grounds."[67]

"[T]he Supreme Court has instructed us that '[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable.'"[68] In *National Wildlife Federation v. National Marine Fisheries Service*,[69] the Ninth Circuit affirmed the district court's finding that the operation of dams during the pendency of the case would cause irreparable harm to certain salmonids absent a preliminary injunction because the species were in a "'precarious', 'imperiled,' and 'perilous' state" and would "remain in such a state without further conservation efforts."[70] Similarly, in *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*, the Ninth Circuit ruled that the plaintiffs would suffer irreparable harm absent preliminary injunctive relief where the project at issue would "lead to

---

[66] Docket 14-3 at 10, ¶ 19.

[67] Docket 14-3 at 11, ¶ 19.

[68] *All. for the Wild Rockies*, 632 F.3d at 1135 (quoting *Lands Council v. MacNair*, 537 F.3d 981, 1004 (9th Cir. 2008)) (italics in original).

[69] 886 F.3d 803, 818 (9th Cir. 2018).

[70] *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 820-21 (9th Cir. 2018).

Case No. 3:26-cv-00097-SLG, *Grandmothers Growing Goodness, et al. v. Burgum, et al.*
Order on Motion for Preliminary Injunction
Page 15 of 20

Case 3:26-cv-00097-SLG    Document 59    Filed 03/18/26    Page 15 of 20

the logging of thousands of mature trees" while the case was pending.[71] The Court

reasoned that "[t]he logging of mature trees, if indeed incorrect in law, cannot be

remedied easily if at all. Neither the planting of new seedlings nor the paying of

money damages can normally remedy such damage."[72]

The immediate environmental harms asserted here are of a different sort.

While Dr. Ahtuangaruak expresses concern about the declining population of the

Herd, Plaintiffs have not shown that the caribou population is endangered or would

be seriously threatened by increased helicopter traffic this summer absent

preliminary injunctive relief, unlike the salmonid population at issue in *National

Wildlife Federation*. Nor have Plaintiffs shown that irreparable harm comparable

to the logging of mature trees, as was the case in *League of Wilderness Defenders*,

will occur this summer absent preliminary injunctive relief.

At oral argument, Plaintiffs referenced *Wilderness Watch v. Perdue* to

support their proposition that helicopter activity may cause irreparable harm.[73]

*Wilderness Watch* involved helicopter-assisted activity in the Frank Church

Wilderness Area in which, under the Wilderness Act of 1964, aircraft landings were

prohibited "except as necessary to meet the minimum administration of the area."[74]

---

[71] 752 F.3d 755, 764 (9th Cir. 2014).

[72] *Id.*

[73] 805 F. App'x 476, 481 (9th Cir. 2020).

[74] *Wilderness Watch v. Vilsack*, 229 F. Supp. 3d 1170, 1175 (D. Idaho 2017) (quoting 16 U.S.C. § 1133(c)), *amended in part*, Case No. 4:16-CV-012-BLW, 2017 WL 3749441 (D. Idaho Aug. 30, 2017), *aff'd in part, rev'd in part and remanded sub nom. Wilderness Watch v. Perdue*, 805 F.

Case No. 3:26-cv-00097-SLG, *Grandmothers Growing Goodness, et al. v. Burgum, et al.*
Order on Motion for Preliminary Injunction
Page 16 of 20

In 2010, the Idaho Department of Fish and Game ("IDFG") sought to conduct a helicopter-assisted project tranquilizing and collaring wolves to study their population decline.[75] "The Forest Service approved the IDFG's plan, prompting environmental groups to file a lawsuit . . . to block the plan because helicopter landings were inconsistent with the wilderness values of the Wilderness Area."[76] Ultimately, the district court permitted a limited, short-term wolf collaring project, but "put the Forest Service on notice that the agency 'would be expected to render a final decision [on any helicopter project in the Wilderness Area] enough in advance of the project so that any lawsuit seeking to enjoin the project could be fully litigated.'"[77] Then, in 2015, IDFG proposed an analogous helicopter-assisted elk collaring project, which the Forest Service approved in January 2016.[78] The next day, the plaintiffs filed their lawsuit in *Wilderness Watch* seeking to stop the project, but within two days, the IDFG completed the study, collaring "57 elk using 112 helicopter landings in the Wilderness Area."[79] The plaintiffs then sought a permanent injunction that would require the IDFG to destroy all data obtained from

---

App'x 476 (9th Cir. 2020).

[75] *Id.* at 1175.

[76] *Id.*

[77] *Id.* (quoting *Wolf Recovery Foundation v. U.S.*, 2010 WL 2898933 at *1 (D. Idaho July 21, 2010)).

[78] *Id.* at 1175-77.

[79] *Id.* at 1177-78.

Case No. 3:26-cv-00097-SLG, *Grandmothers Growing Goodness, et al. v. Burgum, et al.*
Order on Motion for Preliminary Injunction
Page 17 of 20

Case 3:26-cv-00097-SLG    Document 59    Filed 03/18/26    Page 17 of 20

this project.[80]  The district court granted the permanent injunction, finding that "the injury to the plaintiffs' interest in the wilderness character of the Wilderness Area is real and cannot be compensated for by a monetary award."[81]  The Ninth Circuit affirmed this finding.[82]

Wilderness Watch is distinguishable for several reasons, including that here, preliminary, not permanent, injunctive relief is sought, and no activities that involve tranquilizing or collaring any caribou are contemplated here.  Moreover, the irreparable harm found in Wilderness Watch was grounded in the statutory protections governing designated wilderness areas, which strictly limited aircraft landings except as necessary.[83]  No comparable statutory restriction applies here, where the land at issue is part of the NPR-A, a petroleum reserve.  And although the Department has sought to vacate the ROW, it appears that it has adopted mitigation measures in the 2025 IAP ROD aimed at minimizing the impact of helicopters on the Herd.[84]

The Ninth Circuit has recognized irreparable harm where the plaintiffs'

---

[80] Id. at 1178.

[81] Id. at 1183-84.

[82] Wilderness Watch, 805 F. App'x at 481.

[83] See Wilderness Watch, 229 F. Supp. 3d at 1175; see also 16 U.S.C. § 1133(c).

[84] Docket 14-24 at 4 ("The plan includes decisions regarding:" "The stipulations and ROPs will regulate permitted activities (stipulations attach to oil and gas leases and apply only to oil and gas leaseholder activities) in the NPR-A to meet resource and use objectives and thereby mitigate impacts of those activities.").

Case No. 3:26-cv-00097-SLG, Grandmothers Growing Goodness, et al. v. Burgum, et al.
Order on Motion for Preliminary Injunction
Page 18 of 20

Case 3:26-cv-00097-SLG   Document 59   Filed 03/18/26   Page 18 of 20

recreational use and enjoyment of an area set aside for such activities, among other activities, such as a national forest, is impaired. In *Environmental Protection Information Center v. Carlson*, the Ninth Circuit affirmed the district court's finding of irreparable harm where the permanent removal of fire-damaged trees near roads in a national forest would diminish the plaintiff's enjoyment of the national forest.[85] Likewise, in *Alliance for the Wild Rockies v. Cottrell*, the Ninth Circuit held that a logging program would irreparably harm the plaintiff's members' ability to "view, experience, and utilize" the Beaverhead–Deerlodge National Forest in its undisturbed state.[86] Here, unlike the national forests at issue in *Carlson* and *Alliance for the Wild Rockies*, the NPR-A is a petroleum reserve. Accordingly, Plaintiffs do not have the same interest in recreational use and enjoyment that the plaintiffs did with respect to the national forests at issue in *Carlson* and *Alliance for the Wild Rockies*.

As noted above, the Court has stayed the ROW Cancellation Notice in a related case, so Plaintiffs here cannot demonstrate that they are likely to be irreparably harmed by helicopter activities in the ROW area this summer. Nor have Plaintiffs established that they are likely to be irreparably harmed by helicopter activities this summer in the additional areas where they seek to enjoin the lease sales. Because the showing of a likelihood of an irreparable injury in the absence

---

[85] 968 F.3d 985, 991 (9th Cir. 2020).

[86] 632 F.3d 1127, 1135 (9th Cir. 2011).

Case No. 3:26-cv-00097-SLG, *Grandmothers Growing Goodness, et al. v. Burgum, et al.*
Order on Motion for Preliminary Injunction
Page 19 of 20

Case 3:26-cv-00097-SLG    Document 59    Filed 03/18/26    Page 19 of 20

of preliminary injunctive relief is mandatory, the Court does not consider the remaining elements for a preliminary injunction.[87] However, should BLM approve any surface-disturbing activities within the areas Plaintiffs sought to enjoin lease sales before the Court determines the merits of Plaintiffs' challenges, Plaintiffs may seek preliminary injunctive relief related to those activities.

## CONCLUSION

In light of the foregoing, Plaintiffs' Motion for Preliminary Injunction at Docket 14 is DENIED.

DATED this 18th day of March, 2026, at Anchorage, Alaska.

*/s/ Sharon L. Gleason*
UNITED STATES DISTRICT JUDGE

---

[87] *See Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc.*, 762 F.2d 1374, 1378 (9th Cir. 1985) ("The district court's finding that plaintiff failed to show a significant threat of irreparable injury is not clearly erroneous. Because such a showing is a prerequisite to a preliminary injunction, we need not decide whether plaintiff will eventually prevail in its claims.").

Case No. 3:26-cv-00097-SLG, *Grandmothers Growing Goodness, et al. v. Burgum, et al.*
Order on Motion for Preliminary Injunction
Page 20 of 20