RYAN P. STEEN, Bar No. 0912084
ryan.steen@stoel.com
JASON T. MORGAN, Bar No. 1602010
jason.morgan@stoel.com
TIFFANY M. WANG (*admitted pro hac vice*)
tiffany.wang@stoel.com
STOEL RIVES LLP
600 University Street, Suite 3400
Seattle, WA  98101
Telephone:  206.624.0900

*Attorneys for Intervenor-Defendant*
*ConocoPhillips Alaska, Inc.*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | |
| Plaintiffs, | |
| v. | |
| DOUG BURGUM, et al., | |
| Defendants, | |
| STATE OF ALASKA, et al., | |
| Intervenor-Defendants. | Case No. 3:20-cv-00206-SLG |

| | |
|---|---|
| SOVEREIGN IÑUPIAT FOR A LIVING ARCTIC, et al., | |
| Plaintiffs, | |
| v. | |
| DOUG BURGUM, et al., | |
| Defendants, | |
| CONOCOPHILLIPS ALASKA, INC., et al., | |
| Intervenor-Defendants. | Case No. 3:26-cv-00078-SLG |
| GRANDMOTHERS GROWING GOODNESS, et al., | |
| Plaintiffs, | |
| v. | |
| DOUG BURGUM, et al., | |
| Defendants, | |
| CONOCOPHILLIPS ALASKA, INC., et al., | |
| Intervenor-Defendants. | Case No. 3:26-cv-00097-SLG |

### <u>CONOCOPHILLIPS ALASKA, INC.'S RESPONSE TO MOTIONS FOR SUMMARY JUDGMENT</u>

**TABLE OF CONTENTS**

| | | Page |
|---|---|---|

TABLE OF AUTHORITIES ...................................................................................iii

I. INTRODUCTION ...........................................................................................1

II. BACKGROUND ............................................................................................4

    A.    Congress Establishes the NPR-A ...............................................................4

    B.    BLM Implements the NPR-A Leasing Program ..........................................8

    C.    BLM Halts the NPR-A Leasing Program ...................................................11

    D.    Congress Mandates Immediate Resumption of the NPR-A Leasing Program ........................................................................................................12

    E.    BLM Resumes the NPR-A Leasing Program ............................................13

III. ARGUMENT ................................................................................................15

    A.    The Court Should Reject Plaintiffs' Claims That BLM Failed to Protect "Special Areas"....................................................................................15

        1.    The OBBB Act and Congress's nullification of the 2022 IAP foreclose Plaintiffs' "special areas" arguments .............................16

        2.    BLM was not required to explain the 2025 IAP's deviations from the nullified 2022 IAP ............................................................17

        3.    The NPRPA does not prohibit BLM from modifying special area boundaries ................................................................................18

        4.    Plaintiffs misconstrue the "maximum protection" standard ..........20

        5.    The "maximum protection" standard does not apply to leasing .....22

    B.    Plaintiffs' NEPA Claims Irreconcilably Conflict with Ninth Circuit Precedent and the Supreme Court's *Seven County* Decision ....................26

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG

- i -

**TABLE OF CONTENTS**
(continued)

1. The 2020 EIS and 2025 EA provide appropriate NEPA analysis to support the 2026 Lease Sale .........................................27

2. SILA's challenge to the 2025 EA's "purpose and need" statement is meritless .......................................................33

C. BLM Was Not Required to Provide an Additional "Explanation" for the 2026 Lease Sale ..........................................................36

D. The Court Should Reject CBD's Nitpicking of FWS's Programmatic Biological Opinion ..................................................39

1. FWS appropriately considered and analyzed terrestrial denning dynamics ..........................................................40

2. FWS appropriately considered and analyzed polar bear population dynamics ..........................................................41

3. CBD's complaints about FWS's modeled female cub mortality estimates are baseless ........................................43

4. The BiOp's reliance on well-established mitigation measures is reasonable and lawful ......................................46

   a. CBD's claim fails because it is based on inapplicable law ..............................................................46

   b. Regardless of what regulations apply, ROP C-1 is both binding and certain ..............................................48

E. BLM Reasonably Relied on the Existing ANILCA Section 810 Evaluation Conducted for the 2020 IAP EIS ...........................51

F. GGG Lacks Standing to Challenge the Cancellation Notice ....................55

G. Vacatur is Unwarranted ..............................................................61

IV. CONCLUSION ...............................................................................67

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG

Case 3:26-cv-00097-SLG     Document 99     Filed 07/14/26     Page 4 of 80

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska Wilderness Recreation and Tourism Ass'n v. Morrison*,
   67 F.3d 723 (9th Cir. 1995) ............................................................... 54, 55

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
   988 F.2d 146 (D.C. Cir. 1993) ................................................. 61, 62, 64, 65

*Azar v. Allina Health Servs.*,
   587 U.S. 566 (2019) ............................................................................ 25

*Bates v. U.S.*,
   522 U.S. 23 (1997) .............................................................................. 19

*Bennett v. Spear*,
   520 U.S. 154 (1997) ......................................................................... 40, 41

*Bostock v. Clayton County, Ga.*,
   590 U.S. 644 (2020) ............................................................................ 22

*Cal. Cmtys. Against Toxics v. U.S. EPA*,
   688 F.3d 989 (9th Cir. 2012) ................................................................. 61

*Cascadia Wildlands v. BLM*,
   153 F.4th 869 (9th Cir. 2025) ................................................................ 33

*Castillo v. Metro. Life Ins. Co.*,
   970 F.3d 1224 (9th Cir. 2020) ............................................................... 25

*Church of Universal Bhd. v. Farmington Twp. Sup'rs*,
   296 F. App'x 285 (3d Cir. 2008) ............................................................. 57

*Commc'ns Ass'n v. Frey*,
   471 F. Supp. 3d 318 (D. Me. 2020) ......................................................... 18

*Conner v. Burford*,
   848 F.2d 1441 (9th Cir. 1988) ............................................................... 66

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG

*ConocoPhillips Alaska, Inc. v. U.S. Dep't of Interior*,
Case No. 3:24-cv-00142-SLG (Oct. 17, 2024) ........................................................ 12

*Cook County, Ill. v. U.S. ex rel. Chandler*,
538 U.S. 119 (2003) ................................................................................................ 25

*Cook Inletkeeper v. Raimondo*,
541 F. Supp. 3d 987 (D. Alaska 2021) .................................................................... 61

*Cook Inletkeeper v. U.S. Dep't of Interior*,
740 F. Supp. 3d 767 (D. Alaska 2024) .................................................................... 32

*Ctr. for Biological Diversity v. Bernhardt*,
982 F.3d 723 (9th Cir. 2020) ...................................................................... 21, 24, 48

*Ctr. for Biological Diversity v. Salazar*,
695 F.3d 893 (9th Cir. 2012) .................................................................................. 45

*Ctr. for Biological Diversity v. Salazar*,
804 F. Supp. 2d 987 (D. Ariz. 2011) ...................................................................... 49

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
141 F.4th 976 (9th Cir. 2025) .......................................................................... 7, 21, 24

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*,
Case No. 24-cv-04651-JST, 2026 WL 898264 (N.D. Cal. Mar. 30, 2026) ................ 46

*DaimlerChrysler Corp. v. Cuno*,
547 U.S. 332 (2006) ................................................................................................ 55

*Duncan v. Walker*,
533 U.S. 167 (2001) ................................................................................................ 22

*Env't Prot. Info. Ctr. v. U.S. Forest Serv.*,
451 F.3d 1005 (9th Cir. 2006) ................................................................................ 47

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG

*FiberLight, LLC v. Nat'l R.R. Passenger Corp.*,
81 F. Supp. 3d 93 (D.D.C. 2015) ................................................................. 58

*Husky Oil N.P.R. Operations, Inc. v. Sea Airmotive, Inc.*,
724 P.2d 531 (Alaska 1986) ......................................................................... 6

*Idaho Farm Bureau Fed'n v. Babbitt*,
58 F.3d 1392 (9th Cir. 1995) ....................................................................... 64

*Int'l Bhd. of Teamsters v. U.S. Dep't of Transportation*,
861 F.3d 944 (9th Cir. 2017) ........................................................... 36, 38, 39

*Kakarala v. Wells Fargo Bank, N.A.*,
No. CV-10-00208-TUC-FRZ, 2012 WL 1458235 (D. Ariz. Apr. 27, 2012) ............. 57

*Kalorama Citizens Association v. SunTrust Bank Company*,
No. CV 18-528 (BAH), 2020 WL 5653695 (D.D.C. Sept. 23, 2020) ........................ 57

*Kowalski v. Tesmer*,
543 U.S. 125 (2004) ....................................................................... 56, 57, 58

*Loper Bright Enterprises v. Raimondo*,
603 U.S. 369 (2024) ..................................................................................... 22

*Loughrin v. U.S.*,
573 U.S. 351 (2014) ............................................................................... 22, 23

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ............................................................................... 55, 56

*Maine Lobstermen's Ass'n v. NMFS*,
70 F.4th 582 (D.C. Cir. 2023) ................................................................. 39, 46

*Marsh v. Oregon Nat. Res. Council*,
490 U.S. 360 (1989) ..................................................................................... 52

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG

*Miller v. U.S. Forest Serv.*,
No. 1:24-CV-00013-SLG, 2026 WL 1283870 (D. Alaska May 8, 2026) ............ 64, 65

*Mills v. U.S.*,
742 F.3d 400 (9th Cir. 2014) ..................................................................................... 56

*Montana Wildlife Federation v. Haaland*,
127 F.4th 1 (9th Cir. 2025) .................................................................................. 64, 65

*N. Alaska Env't Ctr. v. Kempthorne*,
457 F.3d 969 (9th Cir. 2006) ............................................................................... passim

*N. Alaska Env't Ctr. v. Norton*,
361 F. Supp. 2d 1069 (D. Alaska 2005) ............................................................... 28, 50

*N. Alaska Env't Ctr. v. U.S. Dep't of Interior*,
983 F.3d 1077 (9th Cir. 2020) ............................................................................. passim

*N. Alaska Env't Ctr. v. U.S. Dep't of Interior*,
No. 3:18-cv-00030-SLG, 2018 WL 6424680 (D. Alaska Dec. 6, 2018) .................... 26

*N. Cascades Conservation Council v. U.S. Forest Serv.*,
136 F.4th 816 (9th Cir. 2025) ..................................................................................... 33

*Nat. Res. Def. Council v. EPA*,
542 F.3d 1235 (9th Cir. 2008) .................................................................................... 56

*Nat. Res. Def. Council v. Haaland*,
102 F.4th 1045 (9th Cir. 2024) ............................................................................ 41, 44

*Nat'l Audubon Soc'y v. Haaland*,
No. 3:20-CV-00206-SLG, 2023 WL 5984204 (D. Alaska Sept. 14, 2023) ................. 9

*Nat'l Fam. Farm Coal. v. EPA*,
966 F.3d 893 (9th Cir. 2020) ..................................................................................... 64

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG

Case 3:26-cv-00097-SLG   Document 99   Filed 07/14/26   Page 8 of 80

*Nat'l Wildlife Fed'n v. Espy*,
45 F.3d 1337 (9th Cir. 1995) ..................................................................... 61

*National Audubon Society v. Kempthorne*,
No. 1:05-CV-00008-JKS, 2006 WL 8438583 (D. Alaska Sept. 25, 2006) .......... passim

*National Wildlife Federation v. Nat'l Marine Fisheries Serv.*,
524 F.3d 917 (9th Cir. 2008) ................................................................ 49, 50

*Native Ecosystems Council v. Tidwell*,
599 F.3d 926 (9th Cir. 2010) ..................................................................... 47

*Native Vill. of Chickaloon v. Nat'l Marine Fisheries Serv.*,
947 F. Supp. 2d 1031 (D. Alaska 2013) ....................................................... 43

*Native Vill. of Point Hope v. Jewell*,
740 F.3d 489 (9th Cir. 2014) ..................................................................... 29

*Nuiqsut Trilateral, Inc. v. Burgum*,
No. 3:26-CV-00098-SLG, 2026 WL 734749 (D. Alaska Mar. 16, 2026) ................. 59

*Pac. Rivers Council v. U.S. Forest Serv.*,
942 F. Supp. 2d 1014 (E.D. Cal. 2013) ....................................................... 61

*Petroleum Power Int'l Corp. v. Hidden Passage, LLC*,
No. 5:21-CV-00028-JWH-SP, 2024 WL 1825436 (C.D. Cal. Mar. 27, 2024) .......... 57

*Safari Club Int'l v. Haaland*,
31 F.4th 1157 (9th Cir. 2022) ................................................................... 19

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
747 F.3d 581 (9th Cir. 2014) ..................................................................... 41

*Se. Alaska Conservation Council v. U.S. Forest Serv.*,
443 F. Supp. 3d 995 (D. Alaska 2020) ........................................................ 52

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG
- vii -

Case 3:26-cv-00097-SLG    Document 99    Filed 07/14/26    Page 9 of 80

*Seven County Infrastructure Coal. v. Eagle County, Colo.*,
605 U.S. 168 (2025) .......................................................................................passim

*Sierra Club v. Federal Energy Regulatory Comm'n*,
153 F.4th 1295 (D.C. Cir. 2025) ................................................................. 32, 33

*Sierra Club v. U.S. Dep't of Interior*,
No. 26-3543 (9th Cir. May 29, 2026) .............................................................. 47

*Sierra Forest Legacy v. Sherman*,
951 F. Supp. 2d 1100 (E.D. Cal. 2013) ........................................................... 63

*Sovereign Iñupiat for a Living Arctic v. U.S. Bureau of Land Mgmt.*,
555 F. Supp. 3d 739 (D. Alaska 2021) ............................................................ 35

*Sovereign Iñupiat for a Living Arctic v. U.S. Bureau of Land Mgmt.*,
701 F. Supp. 3d 862 (D. Alaska 2023) ............................................................ 21

*The Wilderness Society v. Kane County*,
632 F.3d 1162 (10th Cir. 2011) ....................................................... 57, 59, 60

*Trout Unlimited v. Lohn*,
559 F.3d 946 (9th Cir. 2009) .......................................................................... 43

*U.S. v. Ron Pair Enters., Inc.*,
489 U.S. 235 (1989) ........................................................................................ 24

*U.S. v. Alpine Land & Reservoir Co.*,
887 F.2d 207 (9th Cir. 1989) .......................................................................... 50

*W. Oil & Gas Ass'n v. EPA*,
633 F.2d 803 (9th Cir. 1980) .......................................................................... 62

*Warth v. Seldin*,
422 U.S. 490 (1975) ................................................................................. 56, 58

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG
- viii -

Case 3:26-cv-00097-SLG    Document 99    Filed 07/14/26    Page 10 of 80

*Western Watersheds Project v. Abbey*,
719 F.3d 1035 (9th Cir. 2013) .......................................................................... 32, 33

**Statutes**

5 U.S.C. § 801 ......................................................................................................... 18

5 U.S.C. § 801(b)(2) ............................................................................................. 3, 17

5 U.S.C. § 801(f) ............................................................................................ 3, 13, 17

16 U.S.C. § 1536(a)(2) ............................................................................................ 39

42 U.S.C. § 6502 .................................................................................................... 19

42 U.S.C. § 6504(a) .......................................................................................... passim

42 U.S.C. § 6506a .................................................................................................. 37

42 U.S.C. § 6506a(a) ........................................................................................ passim

42 U.S.C. § 6506a(b) ............................................................................... 1, 7, 21, 23

42 U.S.C. § 6506a(c) ......................................................................................... 1, 19

42 U.S.C. § 6506a(e) .............................................................................................. 24

42 U.S.C. § 6506a(i)(2) .......................................................................................... 24

42 U.S.C. § 6506a(i)(3)(A) ................................................................................. 24, 25

42 U.S.C. § 6506a(j)(1), (3)-(5) .............................................................................. 24

42 U.S.C. § 6506a(k) .......................................................................................... 24, 25

42 U.S.C. § 6506a(k)(1)(A) ..................................................................................... 24

42 U.S.C. § 6506a(k)(2)-(3) .................................................................................... 24

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG

Case 3:26-cv-00097-SLG    Document 99    Filed 07/14/26    Page 11 of 80

**TABLE OF AUTHORITIES**
(continued)

42 U.S.C. § 6506a(l)(1) ................................................................ 24

42 U.S.C. § 6506a(m) ............................................................... 24, 25

42 U.S.C. § 6506a(n)(1)-(2) ....................................................... 24, 25

42 U.S.C. § 6506a(p)(1)(B)(iii) .......................................................... 24

Pub. L. No. 109-58, 119 Stat. 594, subtit. E, § 347 (2005) .................................. 7

Pub. L. No. 94-258, 90 Stat. 303, tit. 1, § 104(b) (1976) ........................... passim

Pub. L. No. 96-514, 94 Stat. 2957, tit. I (1980) ................................... 1, 34

Pub. L. No. 119-21, § 50105(a) ............................................... 13, 18, 38

Pub. L. No. 119-21, § 50105(b) .................................................. passim

Pub. L. No. 119-21, § 50105(c) .......................................................... 13

Pub. L. No. 119-21, § 50105(d) ........................................... 3, 13, 17, 38

Pub. L. No. 119-47, 139 Stat. 696 (2025) ............................................. 13

**Regulations**

43 C.F.R. part 3130 ................................................................... 37

43 C.F.R. § 2361.0-5(f) ................................................................ 6

43 C.F.R. § 3131.2(a) ................................................................ 37

43 C.F.R. § 3131.2(b) ............................................................ 37, 38

43 C.F.R. § 3131.4-1(a) ............................................................. 37

43 C.F.R. § 3131.4-1(c) ............................................................. 37

50 C.F.R. § 402.14(g)(8) (2019) .................................................... 47

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG

**Page(s)**

41 Fed. Reg. 40,484 (Sept. 20, 1976) ..................................................................... 5

42 Fed. Reg. 28,720 (June 3, 1977) ................................................................... 5, 6

73 Fed. Reg. 28,212 (May 15, 2008) .................................................................. 42

84 Fed. Reg. 44,976 (Aug. 27, 2019) ................................................................ 47

88 Fed. Reg. 62,025 (Sept. 8, 2023) .................................................................. 12

89 Fed. Reg. 24,268 (April 5, 2024) .................................................................. 40

89 Fed. Reg. 38,712 (May 7, 2024) ................................................................... 12

90 Fed. Reg. 48,446 (Oct. 22, 2025) ................................................................. 13

90 Fed. Reg. 51,470 (Nov. 17, 2025) ................................................. 12, 19, 20, 34

**Constitutional Provisions**

U.S. Const., art. III ..................................................................................... 56, 57

**Other Authorities**

126 Cong. Rec. S29489 (1980) ........................................................................... 6

126 Cong. Rec. 20533 (1980) .............................................................................. 6

126 Cong. Rec. 31196 (1980) .............................................................................. 7

H.R. Rep. No. 94-942 (1976) .............................................................................. 5

H.R. Rep. No. 96-1147 (1980) ...................................................................... 1, 35

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG

Case 3:26-cv-00097-SLG     Document 99     Filed 07/14/26     Page 13 of 80

# I. INTRODUCTION

The operating principles governing Alaska's National Petroleum Reserve (the "NPR-A" or "Petroleum Reserve") are straightforward. In the Naval Petroleum Reserves Production Act of 1976 ("NPRPA" or "Petroleum Reserves Act"), Congress set aside the NPR-A to meet the "total energy needs of the Nation" and mandated "an expeditious program of competitive leasing." Pub. L. No. 94-258, 90 Stat. 303 (1976); Pub. L. No. 96-514, 94 Stat. 2957, tit. I (1980); 42 U.S.C. § 6506a(a). At the same time, Congress imposed reasonable mitigation requirements by instructing that "exploration" activities in certain areas "designated" by the Bureau of Land Management ("BLM") must be conducted in a manner that will "assure the maximum protection of . . . surface values *to the extent consistent with the requirements of this Act for the exploration of the reserve*." 42 U.S.C. § 6504(a) (emphasis added). Later, in 1980, Congress gave BLM authority to include measures it "deems necessary" to mitigate significant adverse effects of authorized activities. *Id*. § 6506a(b). Congress also emphasized it did not want lands tied up in wilderness areas or BLM bogged down in multiple-use planning because those processes "inhibit expeditious leasing." H.R. Rep. No. 96-1147, at 33 (1980); *see also* 42 U.S.C. § 6506a(c). Thus, the expeditious leasing program Congress established for the NPR-A was—quite intentionally—streamlined and uncomplicated.

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG

But, over time, BLM—goaded by environmental activist groups (like the plaintiffs in these three cases)—constructed an expansive regulatory and planning regime for the NPR-A. BLM created a new term—"special area"—that does not appear in the statute and then extended the "maximum protection" standard (applicable by statute only to "exploration") to *all* activities in those "special areas." During the Obama administration, BLM indulged in extensive land-use planning to create the first integrated activity plan ("IAP") covering the entire NPR-A (the "2013 IAP"). That plan ballooned "special areas" and banned leasing across large swathes of the NPR-A.

And so began the flip-flopping. During the first Trump administration, BLM produced a new IAP (the "2020 IAP"), supported by a new environmental impact statement (the "2020 EIS"), which scaled back the enlarged special areas and reopened some areas to leasing. During the Biden administration, BLM undid those changes, halted NPR-A leasing altogether, and adopted the "2022 IAP," which simply reverted back to the 2013 IAP.

On July 4, 2025, Congress put an end to the flip-flopping and the delay of the expeditious leasing program it long ago mandated. Specifically, Congress commanded that BLM "shall expeditiously restore and resume oil and gas lease sales" in the NPR-A. Pub. L. 119-21, § 50105(b). Congress required the first sale to occur within one year, identified the areas to be leased as "the areas designated for oil and gas leasing as

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG
- 2 -

described in the" 2020 IAP, and required BLM to use the "same lease form, lease terms, economic conditions, and stipulations as described in the" 2020 IAP. *Id.* § 50105 (b), (d). And to be sure, Congress used the Congressional Review Act to strike down the 2022 IAP, rendering it null and void (as though it "had never taken effect") and prohibiting the adoption of any plan that is "substantially the same" (such as the 2013 IAP). 5 U.S.C. § 801(b)(2), (f).

BLM proceeded accordingly. On December 22, 2025, it adopted the 2025 IAP, which reinstated the provisions of the 2020 IAP. BLM then held a lease sale, offered for sale only those lands designated as open for leasing in the 2020 IAP, and imposed the same terms and conditions identified in the 2020 IAP. In short, BLM did precisely what Congress directed. That should be the beginning and end of the Court's analysis.

Plaintiffs remain dissatisfied. Indeed, they will never be satisfied because their long-held policy goal of impeding and preventing all oil and gas activities in Alaska (and beyond) irreconcilably clashes with Congress's mandate for expeditious leasing and development of the Petroleum Reserve. So, Plaintiffs return to court again, this time with three separate lawsuits and a smorgasbord of claims to try to undo a single lease sale that Congress required. They complain that BLM failed to explain why it deviated from the 2013/2022 IAP—as if BLM was obliged to justify its departure from a plan Congress eliminated. They argue for an expanded "maximum protection" standard that appears

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG

nowhere in the statute and conflicts with Ninth Circuit precedent. They reprise National Environmental Policy Act ("NEPA") arguments repeatedly rejected by this Court and the Ninth Circuit (and that have not aged well in light of the Supreme Court's *Seven County* decision). And they toss in Endangered Species Act ("ESA") and Alaska National Interest Lands Conservation Act ("ANILCA") claims that have no support in the administrative record.

Ultimately, Plaintiffs' stated claims (baseless as they are) are just a front for Plaintiffs' perpetual disagreement with Congress's policy choice for the NRP-A—first expressed by Congress in 1976, then again in 1980, again in 2005, and yet again in 2025. Plaintiffs' recourse is with Congress, not the courts. For these reasons, and those set forth below, this Court should deny Plaintiffs' motions and grant summary judgment in favor of the Defendants and Intervenor-Defendants in full.

## II.  BACKGROUND

### A.  Congress Establishes the NPR-A.

In 1976, Congress passed Public Law 94-258, enacting the Petroleum Reserves Act, which transferred management authority from the Navy to the Department of the Interior and directed that the Petroleum Reserve be managed "in a manner consistent with the total energy needs of the Nation." Pub. L. No. 94-258, 90 Stat. 303 (1976); *N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969, 973 (9th Cir. 2006) ("*Kempthorne*"). In that law,

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG
- 4 -

Congress prohibited production and development of petroleum but required the

continuation of the federal exploration program, instructing that

> [a]ny exploration within the Utukok River, the Teshekpuk
> Lake areas, and other areas designated by the Secretary of the
> Interior containing any significant subsistence, recreational,
> fish and wildlife, or historical or scenic value, shall be
> conducted in a manner which will assure the maximum
> protection of such surface values to the extent consistent with
> the requirements of this Act for the exploration of the reserve.

Pub. L. No. 94-258, 90 Stat. 303, § 104(b) (1976). This requirement was "not a

prohibition of exploration-related activities within such areas" but instead intended to

ensure "that such exploration operations will be conducted in a manner which will

minimize the adverse impact on the environment." H.R. Rep. No. 94-942, at 21 (1976)

(Conf. Rep.).

In 1977, BLM issued regulations to implement Public Law 94-258. 42 Fed. Reg.

28,720 (June 3, 1977). During the rulemaking, BLM explained that "[s]ince the Utukok

River and Teshekpuk Lake areas are known to have special subsistence, ecological, and

environmental significance they are identified in the Regulations to receive maximum

protection under the exploration program." 41 Fed. Reg. 40,484 (Sept. 20, 1976). BLM's

1977 regulations created a new term called "special areas" and defined that term as "areas

within the reserve identified by the Secretary of the Interior as having significant

subsistence, recreational, fish and wildlife, or historical or scenic value and, therefore,

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG

- 5 -

warranting maximum protection of such values to the extent consistent with the requirements of the Act for the exploration of the Reserve." 42 Fed. Reg. at 28,722 (codified at 43 C.F.R. § 2361.0-5(f)). BLM's 1977 regulations describe "maximum protection" as entailing minor adjustments like "rescheduling activities and use of alternative routes" and "limiting types of aircraft in combination with minimum flight altitudes and distances from identified places." *Id*.

By 1980, the United States was "in the middle of an energy crisis." 126 Cong. Rec. 20533 (1980) (statement of Rep. McDade). The government, through its contractor, had spent nearly three-quarters of a billion dollars to drill just 24 wells across the sprawling NPR-A, without discovering any significant deposits. *Id.* at 20533, 20537-38; *see also Husky Oil N.P.R. Operations, Inc. v. Sea Airmotive, Inc.*, 724 P.2d 531, 532 (Alaska 1986). Key members of Congress grew impatient with the lack of NPR-A legislation, stating that "we can no longer delay efforts which would increase the domestic supply of oil and gas and lessen our reliance on imports." 126 Cong. Rec. at S29489 (statement of Sen. Stevens).

Congress therefore proceeded, through an appropriations bill, to authorize development and production in the NPR-A by means of a leasing program. The 1980 legislation included explicit "language to expedite private leasing and exploration of the entire" NPR-A, specifically directing the Secretary of the Interior to carry out "an

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG
- 6 -

expeditious program." *See* 126 Cong. Rec. 31196 (1980) (statement of Sen. Stevens); 42 U.S.C. § 6506a(a). The legislation also required BLM to "provide for such conditions, restrictions, and prohibitions" as it "deems necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects on the surface resources" of the NPR-A. 42 U.S.C. § 6506a(b). "This final authorization—the 'mitigation mandate'—is discretionary." *Ctr. for Biological Diversity v. BLM*, 141 F.4th 976, 1001 (9th Cir. 2025).

In 2005, Congress again amended the Petroleum Reserves Act to add more incentives to encourage expeditious development. *See* Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594, subtit. E, § 347 (2005). Specifically, Congress extended the potential terms of leases to 30 years, made it easier to renew leases, provided for unit agreements to efficiently develop leases, and included other measures "[t]o encourage the greatest ultimate recovery of oil or gas." *Id.* Congress also added language mandating that BLM "shall conduct" the "expeditious program of competitive leasing" required by the Act. *Id.* (codified at 42 U.S.C. § 6506a(a)).

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG
- 7 -

Case 3:26-cv-00097-SLG    Document 99    Filed 07/14/26    Page 20 of 80

**B.      BLM Implements the NPR-A Leasing Program.**

BLM held the first four NPR-A lease sales from 1981 to 1984, but the location and remoteness of the Petroleum Reserve presented logistical challenges.[1] Subsequent discovery of oil in the Colville River Unit in 1994 sparked renewed leasing interest.[2] In the late 1990s, BLM began planning for exploration and development of the Petroleum Reserve through an area-specific framework, which eventually morphed into reserve-wide IAPs by 2013.

In 2004, BLM finalized the EIS for the Northwest Planning Area for the leasing of 8.8 million acres of the Petroleum Reserve ("2004 NWPA EIS"). *Kempthorne*, 457 F.3d at 974. Because "BLM had no way of knowing what, if any, areas subsequent exploration would find most suitable for drilling[,] it did not do an analysis of any specific parcels" for purposes of the EIS. *Id.* Instead, BLM analyzed the possible environmental effects using two hypothetical scenarios to illustrate both ends of the spectrum of possibilities of exploring and drilling in the Petroleum Reserve. *Id.* The Ninth Circuit affirmed this approach in *Kempthorne*, concluding that this level of analysis was appropriate for the

---

[1] *See* Congressional Research Service, *National Petroleum Reserve in Alaska (NPR-A): A Summary*, at 1 (September 30, 2025), https://www.congress.gov/crs_external_products/IF/PDF/IF13119/IF13119.1.pdf.

[2] *See id.*

leasing stage. *Id.* at 977. BLM issued multiple lease sales under the 2004 NWPA EIS. *Id.* at 974. BLM also issued a 2008 EIS for the Northeast Planning Area. BLM_024630.

In 2013, BLM finalized the first IAP and an associated EIS that addressed management of all BLM-managed lands in the Petroleum Reserve ("2013 IAP EIS"). *N. Alaska Env't Ctr. v. U.S. Dep't of the Interior*, 983 F.3d 1077, 1082 (9th Cir. 2020) ("*NAEC*"). BLM again relied on hypothetical development scenarios to analyze the environmental consequences of five alternative proposals for a range of land allocations, including various options for the percentage of lands that would be available for oil and gas leasing and multiple measures designed to mitigate environmental impacts. *Id.* The 2013 IAP EIS closed approximately 11 million acres of the NPR-A to leasing and made about 2.5 million acres available for leasing but subject to "No Surface Occupancy" stipulations that do not allow for surface construction. *See* BLM_027300; *Nat'l Audubon Soc'y v. Haaland*, No. 3:20-CV-00206-SLG, 2023 WL 5984204, at *2 (D. Alaska Sept. 14, 2023). The 2013 IAP made the remaining 9.3 million acres of the Petroleum Reserve available for leasing and new oil and gas infrastructure, subject to terms and conditions designed to protect NPR-A surface resources. *See* BLM_002351-54; BLM_002357.

BLM intended the 2013 IAP EIS to fully satisfy NEPA's requirements for the first oil and gas lease sale after the 2013 IAP EIS and that subsequent lease sales would require preparation of an administrative determination of NEPA adequacy tiering off the

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG
- 9 -

Case 3:26-cv-00097-SLG    Document 99    Filed 07/14/26    Page 22 of 80

2013 IAP EIS. *NAEC*, 983 F.3d at 1082. Multiple lease sales held after 2013 were challenged, including on the grounds that the 2013 IAP EIS was inadequate to support those lease sales. Finding *Kempthorne* controlling, the Ninth Circuit again concluded that the level of analysis conducted in the 2013 IAP EIS satisfied NEPA at the leasing stage and that "parcel-specific analysis was not required until BLM was reviewing actual exploration and development proposals." *Id.* at 1083-84, 1089-90.

In 2020, BLM conducted a comprehensive review of the 2013 IAP EIS and issued the 2020 IAP EIS, which "authorize[d] lease sales, but would not authorize any on-the-ground activity associated with the exploration or development of oil and gas resources or other land uses, in the [Petroleum Reserve]." BLM_000037. The 2020 IAP EIS was intended "to fulfill NEPA requirements for lease sales conducted at least through December 2039 and potentially thereafter." BLM_000042. As in the predecessor IAP, BLM considered five alternatives comprised of different land allocations that varied in percentages of lands that would be available for oil and gas leasing, examined current special area boundaries, and evaluated new or revised lease stipulations and required operating procedures. BLM_000037; BLM_000043-45. As before, BLM used a range of hypothetical development scenarios to assess the potential impacts of future lease sales. BLM_000032-33; BLM_000043-49.

The 2020 IAP EIS made clear that "[b]efore [BLM] conducts the second and each subsequent lease sale, the BLM will evaluate the adequacy of the IAP/EIS in light of new information and circumstances to determine whether it requires supplementation or revision in order to comply with NEPA" and that "additional site-specific terms and conditions" may be required before BLM will authorize "any oil and gas activity based on the project-level NEPA analysis." BLM_000042. Furthermore, "[a]pplicants would be subject to the terms of the lease, including lease stipulations in effect at the time the lease is issued or renewed, and required operating procedures adopted in the ROD for this IAP/EIS" and "the BLM Authorized Officer may require additional site-specific terms and conditions before authorizing any oil and gas activity based on the project-level NEPA analysis." BLM_000042.

## C.     BLM Halts the NPR-A Leasing Program.

BLM halted all NPR-A leasing from 2020 to 2026. In April 2022, BLM issued the 2022 IAP, which revoked the 2020 IAP. BLM_002351-52. On September 20, 2022, BLM issued an "errata" that purported to change the scope of the 2020 EIS ("2022 Errata"). BLM_002436-38. The 2022 Errata attempted to delete the language stating that the 2020 IAP EIS covered "lease sales conducted at least through December 2039" and claimed that the 2020 IAP EIS "is not intended to, by itself and without further NEPA analysis, fulfill NEPA requirements for future lease sales." BLM_002438.

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG

In 2024, in an attempt to cement the Biden administration's refusal to carry out Congress's leasing program, BLM—under the direction of the now-president of the Wilderness Society—issued a new rule that "establish[ed] an outright prohibition on any new leasing in 10.6 million acres, more than 40 percent of the NPR-A" and established "a presumption against leasing and new infrastructure" in all special areas. BLM, *Proposed NPR-A Rule Fact Sheet*, at 1, https://www.blm.gov/sites/default/files/docs/2023-10/Fact%20Sheet%20NPR-A_ext%20update_clean_508.pdf; 88 Fed. Reg. 62,025, 62,036 (Sept. 8, 2023); 89 Fed. Reg. 38,712 (May 7, 2024). The rule was promptly challenged by the State of Alaska, the North Slope Borough, an Alaska Native coalition, a trade association, and multiple oil and gas companies. *See ConocoPhillips Alaska, Inc. v. U.S. Dep't of Interior*, Case No. 3:24-cv-00142-SLG, Dkt. 20 (Oct. 17, 2024). On November 17, 2025, BLM, under the second Trump administration, rescinded the challenged rule, and the lawsuits were subsequently dismissed. 90 Fed. Reg. 51,470 (Nov. 17, 2025) (rescinding rule because it "conflicts with and exceeds its statutory authority" under the NPRPA). No one has challenged BLM's rescission of the admittedly unlawful rule.

**D.      Congress Mandates Immediate Resumption of the NPR-A Leasing Program.**

On July 4, 2025, Congress required, in the One Big Beautiful Bill Act ("OBBB Act"), that "the Secretary shall expeditiously restore and resume oil and gas lease sales

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG

under the Program," which shall occur "in the areas designated for oil and gas leasing as described in the NPR-A final environmental impact statement" (defined as the 2020 IAP EIS) "and the NPR-A record of decision [("ROD")]" (defined as the 2020 IAP ROD). Pub. L. 119-21, § 50105(a), (b). Congress rejected the 2022 Errata by defining the 2020 EIS as "excluding the errata sheet dated September 20, 2022." *Id*. § 50105(a)(1). Congress mandated five lease sales in the next 10 years, including one in the first year, and instructed that the leased lands should only be subject to those stipulations and conditions set forth in the 2020 IAP. *Id*. § 50105(c), (d).

Under the Congressional Review Act, Congress also permanently repealed the 2022 IAP. Pub. L. No. 119-47, 139 Stat. 696 (2025). Consequently, the 2022 IAP is a nullity *ab initio* and BLM is prohibited from implemented any action that is "substantially the same" (such as the 2013 IAP). *See* 5 U.S.C. § 801(f); Pub. L. No. 119-47. The 2020 IAP then became operative until BLM issued a new IAP.

## E.    BLM Resumes the NPR-A Leasing Program.

Following Congress's directive, BLM, in October 2025, issued a call for nominations, stating that all lands identified by the 2020 IAP as open to leasing were potentially available and requested public comment on which lands should be offered for sale. 90 Fed. Reg. 48,446 (Oct. 22, 2025); BLM_130521. In December 2025, BLM issued a final environmental assessment ("2025 EA") and adopted a new IAP (the "2025

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG
- 13 -

IAP"). BLM_022752; BLM_024536-38. The 2025 EA supplements the 2020 EIS so BLM can "determine the appropriate management of all BLM-managed lands in the [Petroleum Reserve] in a manner consistent with existing statutory and executive direction, including [Public Law] 119-21, [Executive Order] 14153, and [Secretarial Order] 3422." BLM_022758. The 2025 EA "evaluates new circumstances and information that have arisen since the publication of the 2020 IAP/EIS to ensure that the environmental analysis previously conducted is sufficient or is updated and expanded upon, as appropriate." BLM_022758.

The 2025 IAP adopts Alternative E from the 2020 EIS, which is the same alternative adopted by the 2020 IAP. BLM_024536-38. The 2025 IAP sets essentially the same terms, conditions, and stipulations as the 2020 IAP. The 2025 IAP, like its predecessors, "does not authorize any specific on-the-ground activity associated with the exploration for or development of oil and gas resources within the NPR-A," and future on-the-ground actions require separate BLM approval of a "project-specific proposal and would be addressed in separate decisions." BLM_024544.

In February 2026, based on the input from the call for nominations, BLM issued its "notice of sale" and the "detailed statement of sale" on February 11, 2026. BLM_130697-790. The notice of sale identified which tracts would be available for bid

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG
- 14 -

and set the time and terms of the sale to be held on March 18, 2026. BLM_130694-95, BLM_130707-33.

On March 18, 2026, BLM conducted an oil and gas lease sale for the NPR-A ("2026 Lease Sale"), which generated $163,696,722 in revenue. BLM_130792. In total, BLM offered 625 tracts across 5.5 million acres, and 11 companies successfully submitted bids on 187 tracts that span 1,334,967 acres. BLM_130792. The State of Alaska receives 50 percent of the revenue generated by the 2026 Lease Sale, which amounts to nearly $82 million. BLM_130792. Those proceeds will be available to North Slope communities through the NPR-A Impact Mitigation program. Press Release, BLM, *Interior generates over $163 million from National Petroleum Reserve in Alaska oil and gas lease sale* (Mar. 18, 2026), https://www.blm.gov/press-release/interior-generates-over-163-million-national-petroleum-reserve-alaska-oil-and-gas.

### III. ARGUMENT

**A. The Court Should Reject Plaintiffs' Claims That BLM Failed to Protect "Special Areas."**

Each set of Plaintiffs argues, variously, that BLM failed to "protect" special areas. Plaintiffs complain that BLM offered land for lease in special areas, reduced the size of special areas in the 2025 IAP, failed to impose enough mitigation measures, and failed to explain the 2025 IAP decisions against different decisions made in the (nullified) 2022 IAP. Center for Biological Diversity et al. ("CBD") Br. at 26-32; Sovereign Iñupiat for a

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG

Living Arctic et al. ("SILA") Br. at 15-24; Grandmothers Growing Goodness et al. ("GGG") Br. at 7-11, 15-18.[3] These claims are meritless and should be rejected for at least the following reasons.

> **1. The OBBB Act and Congress's nullification of the 2022 IAP foreclose Plaintiffs' "special areas" arguments.**

Plaintiffs' "special areas" arguments ultimately boil down to their dissatisfaction with BLM's decision to reinstall the special area designations and associated protections contained in the 2020 IAP. BLM did so by issuing the 2025 IAP, which mirrors the 2020 IAP. Plaintiffs may not like that result, but their dispute is with Congress.

In 2025, Congress took decisive action to resume the NPR-A leasing program as set forth in the 2020 IAP. Specifically, the OBBB Act instructs that BLM "shall expeditiously restore and resume oil and gas lease sales . . . in the areas designated for oil and gas leasing as described in" *the 2020 IAP ROD and 2020 EIS*. Pub. L. 119-21, § 50105(b). This is not discretionary. This language was necessary because BLM, starting in 2020, refused to continue the expeditious leasing program that Congress mandated in 1980 and reaffirmed in 2005. There is nothing in the OBBB Act that states or even suggests that BLM cannot lease lands that were closed to leasing under the 2022 IAP. To the contrary, the OBBB Act requires BLM to offer lease sales in the areas

---

[3] Citations to pleadings refer to the internal page numbers, not ECF-stamped page numbers.

designated as open to leasing under the 2020 IAP and instructs that BLM "shall" apply the 2020 IAP stipulations to the leased lands. *Id.* § 50105(b), (d).

Congress made this mandate doubly clear by nullifying the 2022 IAP under the Congressional Review Act, which disposes of any notion that BLM was required to retain—or could have retained—the 2022 IAP's expanded special areas or otherwise apply measures in the 2022 IAP that are different than the measures in the 2020 IAP. That congressional action renders the 2022 IAP as though it "had never taken effect" and prohibits the adoption of any plan that is "substantially the same." 5 U.S.C. § 801(b)(2), (f). None of Plaintiffs' "special areas" arguments can be sustained because they either dispute BLM's congressionally mandated decision to abandon the 2022 IAP or argue for the imposition of measures beyond those contained in the 2020/2025 IAP.

**2.** **BLM was not required to explain the 2025 IAP's deviations from the nullified 2022 IAP.**

Plaintiffs argue that BLM failed to "adequately explain[] its departure from previous factual findings [in the 2013/2022 IAP] that the removed areas should be designated as special areas based on the presence of significant values." CBD Br. at 32; SILA Br. at 21 ("BLM did not explain its decision to offer this area, particularly in light of its prior findings that not offering this area ensure that the agency would comply with its maximum protection mandate."). But, as explained above, Congress *nullified* the 2022 IAP (and thus the 2013 IAP) and required the leasing program to proceed under the terms

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG
- 17 -

of the 2020 IAP. *See* Pub. L. 119-21, § 50105(a), (b). When BLM issued the 2025 IAP, the operative planning document at the time was the 2020 IAP (per Congress's mandate), which had already eliminated the Colville River Special Area, modified the boundaries of the Teshekpuk Lake Special Area ("TLSA"), and made the TLSA available for leasing. BLM_000046-47; BLM_000049. The 2025 IAP incorporated those same provisions when it maintained Alternative E in the 2020 IAP ROD, consistent with Congress's mandate.

Accordingly, the 2025 IAP does not depart in the least bit from the reinstated 2020 IAP that supplanted, per congressional directive, the nullified 2022 IAP. And BLM had no obligation to justify *Congress's* decision to eliminate the 2022 IAP. *See ACA Connects - Am.'s Commc'ns Ass'n v. Frey*, 471 F. Supp. 3d 318, 324 (D. Me. 2020) ("An expression of congressional disapproval under the CRA simply makes it 'as though such rule had never taken effect,' 5 U.S.C. § 801, returning to the status quo ante."). Again, if Plaintiffs dislike that change in policy, their complaint is with Congress.

### 3. The NPRPA does not prohibit BLM from modifying special area boundaries.

CBD relatedly argues that BLM has no authority to remove or modify the boundaries of special areas. CBD Br. at 26-29. But Section 6504(a) of the NPRPA does not even contain the term "special areas," much less require the designation of such areas to be permanently fixed. If Congress intended to tie BLM's hands any time it designates a

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG
- 18 -

"special area," it would have said so. Courts "ordinarily resist reading words or elements into a statute that do not appear on its face." *Bates v. U.S.*, 522 U.S. 23, 29 (1997).

CBD likens Section 6504(a) to the President's authority to withdraw lands under Section 12(a) of Outer Continental Shelf Lands Act ("OCSLA"). *See* CBD Br. at 27-29. That is not an apt comparison. Section 6504(a) does not grant BLM authority to *withdraw* lands from designated uses. Rather, the entirety of the Petroleum Reserve was "withdrawn" from all public lands laws and set aside for the oil and gas program, 42 U.S.C. § 6502, and Congress stripped BLM of its usual authority to tie up lands for wilderness purposes. *Id*. § 6506a(c). Section 6504(a) is merely "a subordinate clause to implement appropriate safeguards for environmental protection." 90 Fed. Reg. at 51,477. Indeed, the statute is clear that "maximum protection" applies only "to the extent consistent with the requirements of this Act for the exploration of the reserve." 42 U.S.C. § 6504(a). There is nothing in the statute or the regulations that prohibits BLM from revising its determinations as to which lands require such protection.

Here, BLM revised its special areas in the NPR-A as part of comprehensive IAP revisions and provided rational reasons for choices it made. Nothing more is required. *Safari Club Int'l v. Haaland*, 31 F.4th 1157, 1175 (9th Cir. 2022) ("[T]he agency need only articulate a rational basis for the disputed decision or rule."). Besides, even if congressional endorsement of BLM's revisions to special areas designations were

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG

required, it is present here. As explained above, Congress invalidated the 2022 IAP under the Congressional Review Act, which reinstated the 2020 IAP and the exact same special areas contained in the 2025 IAP. If Congress thought that the reductions in special area designations in the 2020 IAP trampled on its exclusive property clause authority, as CBD claims, then it would not have mandated a return to the 2020 IAP.

### 4. Plaintiffs misconstrue the "maximum protection" standard.

Plaintiffs further argue that offering leases in special areas violates the "maximum protection" requirement, with SILA suggesting that the "presumption against leasing in areas open for leasing within Special Areas was the 'regulatory floor' needed to provide maximum protection." SILA Br. at 23. What presumption? The only such "presumption" against leasing in special areas appeared in the admittedly "unlawful" Biden-era rule that BLM rescinded (a rescission that has gone unchallenged). 90 Fed. Reg. at 51,477 ("the 2024 NPR-A rule created a regulatory framework that is unlawful under the NPRPA"). In rescinding the rule, BLM clarified that "the purpose of the NPRPA is primarily to facilitate oil and gas leasing and associated activities and that the direction to protect surface values, both within and outside special areas is a secondary purpose of the NPRPA." 90 Fed. Reg. at 51,471. In other words, the "maximum protection" obligation is "subordinate" to the other objective of the Act and "limited by the primary statutory

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG
- 20 -

directive to expeditiously pursue an oil and gas leasing program and to authorize exploration of, and production from, the reserve." *Id*. at 51,477.

Regardless, Plaintiffs are flat wrong. The Ninth Circuit has held that claims, such as those made by Plaintiffs here, "stumble[] from the get-go" because the "Act grants broad discretion to the Secretary to determine the specifics of how to protect surface resources in the NPR-A." *CBD*, 141 F.4th at 1003. The Ninth Circuit explained that "activity in designated special areas must maximally protect surface values, *but only 'to the extent consistent with the requirements of [the] Act for the exploration of the reserve.'*" *Id*. at 1002 (quoting 42 U.S.C. § 6504(a) (emphasis added)). BLM can do this by, in its discretion, "imposing 'conditions, restrictions, and prohibitions' seen as 'necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects on the surface resources' of the NPR-A." *Id.* (quoting 42 U.S.C. § 6506a(b)). BLM did precisely this by identifying mitigation requirements in the 2025 IAP and applying those to leases. BLM_130734-73. Nothing more is required.

Contrary to Plaintiffs' claims, "maximum protection" does not require making special areas unavailable for leasing, preventing the reduction of special areas, or presuming that leasing in special areas conflicts with "maximum protection." In fact, Congress "clearly envisioned that [special areas] would be developed for oil and gas production." *SILA v. BLM*, 701 F. Supp. 3d 862, 880 (D. Alaska 2023), *aff'd in part,*

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG
- 21 -

*rev'd in part and remanded sub nom. CBD v. BLM*, 141 F.4th 976 (9th Cir. 2025). Plaintiffs' claims misconstrue the "maximum protection" standard and should therefore be denied.

### 5.     The "maximum protection" standard does not apply to leasing.

In any event, the "maximum protection" standard does not apply to leasing decisions in the first place. 42 U.S.C. § 6504(a). That is made clear in the NPRPA, and BLM's previous practice of misapplying the standard to other activities is irrelevant under recent Supreme Court precedent.

Specifically, in *Loper Bright Enterprises v. Raimondo*, the Supreme Court eliminated deference to agencies in their interpretation of statutes. 603 U.S. 369, 400 (2024). "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority[.]" *Id.* at 412. The Court explained that every statutory provision has "a single, best meaning" and that "meaning is fixed at the time of enactment." *Id.* at 400 (citation omitted). Determining that "single, best meaning" requires applying traditional tools of statutory interpretation. *Id.* at 400-01; *Bostock v. Clayton County, Ga.*, 590 U.S. 644, 674-75 (2020). Statutory interpretation begins with the language of the statute, giving effect to every clause and word of a statute whenever possible. *Loughrin v. U.S.*, 573 U.S. 351, 358 (2014); *Duncan v. Walker*, 533 U.S. 167,

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG
- 22 -

172 (2001). Courts should presume Congress intentionally included or omitted language in specific sections of a statute. *Loughrin*, 573 U.S. at 358.

The statute says: "Any *exploration* within [designated special areas] shall be conducted in a manner which will assure the maximum protection of such surface values to the extent consistent with the requirements of this Act for the *exploration* of the reserve." 42 U.S.C. 6504(a) (emphases added). Under this plain text, the "maximum protection" requirement applies to "exploration" activities, not to "leasing" decisions, and, even then, is limited to measures that are "consistent with the requirements of this Act." *Id*.

This plain reading makes sense because when Congress enacted the language from Section 6504(a) in 1976, "exploration" was the only activity allowed in the Petroleum Reserve, and that exploration was being conducted only by the federal government. There was no leasing at that time, and both "production" and "development leading to production" were expressly "prohibited" absent further action from Congress. Pub. Law 94-258, tit. 1, § 104(a) (1976). When Congress enacted the leasing program in 1980 and authorized private exploration activities, as well as production and development activities, it provided a new mechanism to address surface protections for all "activities" under the new program. 42 U.S.C. § 6506a(b). This gave BLM discretionary authority to prescribe "conditions, restrictions, and prohibitions seen as necessary or appropriate to

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG
- 23 -

mitigate reasonably foreseeable and significantly adverse effects on the surface resources" for all NPR-A activities. *CBD*, 141 F.4th at 1002 (internal quotation marks omitted). These are the mitigation provisions that apply to leasing decisions, not the previously enacted restrictions applicable to federal exploration activities. "[W]here . . . the statute's language is plain, the sole function of the courts is to enforce it according to its terms." *U.S. v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) (citation and internal quotation marks omitted).

Moreover, Congress carefully crafted and refined the Petroleum Reserves Act over the years, deliberately using the word "exploration" when it meant "exploration,"[4] "production" when it meant "production,"[5] "development" when it meant "development,"[6] and "leasing" when it meant "leasing."[7] This is because each term represents a distinct stage in the standard life cycle of oil and gas operations. *See Kempthorne*, 457 F.3d at 977 ("[U]ncertainty is an inherent problem with multi-stage projects such as oil and gas programs, which include *separate leasing, exploration, and development stages*." (emphasis added)). And each stage is subject to independent

---

[4] *See*, *e.g.*, 42 U.S.C. § 6506a(i)(3)(A), (k), (m), (n)(2) (using the word "exploration").

[5] *See*, *e.g.*, 42 U.S.C. § 6506a(j)(3)-(5), (k)(2)-(3), (n)(2), and (p)(1)(B)(iii) (using the word "production").

[6] *See*, *e.g.*, 42 U.S.C. § 6506a(i)(2), (i)(3)(A), (j)(1), (j)(5), (k)(1)(A), and (l)(1) (using the word "development").

[7] *See*, *e.g.*, 42 U.S.C. § 6506a(a), (e), and (n)(1) (using the word "leasing").

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG
- 24 -

decision-making and approval by BLM and other agencies, along with additional review and analysis under NEPA. *Kempthorne*, 457 F.3d at 977; *see also* BLM_024544; FWS2025_00412.

To be fair, the Alaska district court, in *National Audubon Society v. Kempthorne*, summarily concluded that "the 'maximum protection' provision of § 6504(a) applies to the leasing activity authorized by the ROD." No. 1:05-CV-00008-JKS, 2006 WL 8438583, at *14 (D. Alaska Sept. 25, 2006) (citing 42 U.S.C. § 6506a(n)(2) ("[A]ny exploration or production undertaken pursuant to this section shall be in accordance with section 6504(a) of this title.")). Respectfully, that conclusion is wrong and unpersuasive. The court did not address how the plain meaning of the words "exploration or production" can be construed to mean "leasing" (or "development"). If Congress wanted to include "leasing" decisions within the scope of Section 6506a(n)(2), it would have expressly said so.[8] Regardless, the court went on to correctly hold that "maximum protection" does not mean "no development" and is subservient to the "mandate to

---

[8] *See*, *e.g.*, 42 U.S.C. § 6506a(i)(3)(A), (k), (m), (n)(2) (using the word "exploration"); *see Cook County, Ill. v. U.S. ex rel. Chandler*, 538 U.S. 119, 133 (2003) ("Congress could have done that, of course, but it makes no sense to suggest Congress did it under its breath."); *Azar v. Allina Health Servs.*, 587 U.S. 566, 574 (2019) ("This Court does not lightly assume that Congress silently attaches different meanings to the same term in the same or related statutes."); *Castillo v. Metro. Life Ins. Co.*, 970 F.3d 1224, 1232 (9th Cir. 2020) ("[W]hen a statute designates certain persons, things, or manners of operation, all omissions should be understood as exclusions." (citation omitted)).

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG
- 25 -

develop a program of competitive leasing." *National Audubon Society*, 2006 WL 8438583, at *15-16.

**B.     Plaintiffs' NEPA Claims Irreconcilably Conflict with Ninth Circuit Precedent and the Supreme Court's *Seven County* Decision.**

SILA argues that the 2020 EIS and 2025 EA "did not provide a site-specific analysis of the 2026 lease sale or future lease sales, despite BLM's claim that the analysis is intended to cover lease sales for the foreseeable future." SILA Br. at 29-30. CBD presses the same point, disguising it as an argument that BLM "failed entirely" to "evaluate reasonable alternatives" for the 2026 Lease Sale. CBD Br. at 15. According to CBD, the 2020 EIS and 2025 EA are "programmatic analyses [that] do not evaluate any individual lease sale decision or consider lease-sale alternatives." *Id*. Cutting through the rhetoric, both SILA and CBD just argue (again) that an IAP EIS is insufficient under NEPA to address a subsequent lease sale carried out under the IAP. That argument has been addressed and rejected—repeatedly—by the Ninth Circuit and this Court. *Kempthorne*, 457 F.3d at 977; *NAEC*, 983 F.3d at 1089-90; *N. Alaska Env't Ctr. v. U.S. Dep't of the Interior*, No. 3:18-cv-00030-SLG, 2018 WL 6424680, at *4 (D. Alaska Dec. 6, 2018).

NEPA is a "purely procedural statute," not a "blunt and haphazard tool employed by project opponents (who may not always be entirely motivated by concern for the environment) to try to stop or at least slow down new infrastructure and construction

projects." *Seven County Infrastructure Coal. v. Eagle County, Colo.*, 605 U.S. 168, 183-84 (2025). Plaintiffs' NEPA claims—which are intended to impede and delay congressionally mandated action—should be denied.

> ### 1. The 2020 EIS and 2025 EA provide appropriate NEPA analysis to support the 2026 Lease Sale.

In the same context presented here (*i.e.*, a challenge to an NPR-A IAP EIS and lease sales), the Ninth Circuit held that BLM has the discretion to perform a NEPA analysis that is "both broad-scale and site-specific" and that agencies are afforded deference "about the appropriate level of analysis so long as the EIS provides as much environmental analysis as is reasonably possible under the circumstances." *NAEC*, 983 F.3d at 1087-88. The Supreme Court recently and forcefully reaffirmed that "the central principle of judicial review in NEPA cases is deference." *Seven County*, 605 U.S. at 179. "[I]n deciding whether a previous EIS *is* the EIS for a subsequent action, we find it appropriate to rely on an EIS's defined scope." *NAEC*, 983 F.3d at 1093. Here, BLM defined the scope of the 2020 EIS, as updated and incorporated by the 2025 EA, to include "lease sales conducted at least through December 2045 and potentially thereafter."[9] BLM_022760; *see also* BLM_000037-42. Thus, BLM's NEPA analysis

---

[9] Despite this clear language, SILA claims the 2020 EIS "was not intended to fulfill the agency's obligation to do a site-specific analysis prior to future lease sales." SILA Br. at 32. But this claim is based on the 2022 Errata, which was a political stunt that attempted a wholesale, after-the-fact change to the scope of the 2020 EIS in furtherance

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG
- 27 -

Case 3:26-cv-00097-SLG    Document 99    Filed 07/14/26    Page 40 of 80

expressly includes the 2026 Lease Sale (and future lease sales). The Ninth Circuit has twice sanctioned this approach.

*First*, in *Kempthorne*, the plaintiffs challenged an EIS prepared for a prior NPR-A regional plan under which BLM had already issued numerous leases. 457 F.3d at 973-74; *See N. Alaska Env't Ctr. v. Norton*, 361 F. Supp. 2d 1069, 1072-73 (D. Alaska 2005). As here, the plaintiffs challenged lease sales, claiming the EIS was inadequate for those lease sales. *Kempthorne*, 457 F.3d at 973-74. As here, BLM evaluated the environmental impacts of leasing using a hypothetical development scenario applied to a range of action alternatives. *Id.* at 974. The plaintiffs argued "that by not undertaking a parcel by parcel analysis of the environmental consequences of projected exploration and drilling, the BLM had failed to satisfy the NEPA requirement of site specific analysis." *Id.*

The Ninth Circuit rejected those arguments, affirming BLM's use of a hypothetical development scenario and observing that "until the lessees do exploratory work, the government cannot know what sites will be deemed most suitable for exploratory drilling, much less for development." *Id.* at 976. The court explained that the hypothetical analysis "at the leasing stage" satisfied NEPA and concluded that the plaintiffs' position was an impossible "'chicken or egg' conundrum in that if plaintiffs'

of the Biden administration's policy goal to halt leasing in the NPR-A. Congress saw that stunt for what it was and *eliminated* the 2022 Errata. *See supra*, pages 11-12.

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG
- 28 -

interpretation of its requirements were adopted, NEPA could never be satisfied in the circumstances of this case." *Id.*; *see also Native Vill. of Point Hope v. Jewell*, 740 F.3d 489, 493-94 (9th Cir. 2014) ("An agency is not required at the lease sale stage to analyze potential environmental effects on a site-specific level of detail.").

*Second*, in *NAEC*, the plaintiffs repackaged the claims from *Kempthorne* when challenging BLM's reliance on the 2013 IAP EIS for future lease sales in the Petroleum Reserve, including the 2017 lease sale that had already taken place. 983 F.3d at 1087-90. The Ninth Circuit rejected the argument, holding *Kempthorne* controlling. *Id.* at 1089-90; *see id.* at 1088 ("[N]othing in NEPA or our caselaw prevents agencies from using a single document to undertake both a programmatic-level analysis and a site-specific analysis[.]"). The court recognized that, as here, the 2013 IAP EIS was expressly designed to analyze alternatives for leasing decisions at the planning stage and to support subsequent lease sales. *Id.* at 1090. Although the Ninth Circuit ultimately found it unnecessary to determine "the precise degree of site specificity required" because plaintiffs' claims were time-barred, the court nevertheless observed that it was "not persuaded that the degree required for the 2017 lease sale was so clearly greater than that reflected in the [2013 IAP] EIS that the [2013 IAP] EIS could not have covered the 2017 lease sale." *Id.* In *Seven County*, the Supreme Court emphatically reaffirmed this deferential approach:

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG
- 29 -

> [W]hen assessing significant environmental effects and feasible alternatives for purposes of NEPA, an agency will invariably make a series of fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry—and also about the length, content, and level of detail of the resulting EIS. Courts should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of reasonableness.

*Seven County*, 605 U.S. at 169; *see also id.* at 181 ("the question of whether a particular report is detailed enough in a particular case itself requires the exercise of agency discretion—which should not be excessively second-guessed by a court").

The Ninth Circuit's decisions also make practical sense because "[a]t the earliest stage, the leasing stage we have before us, there is no way of knowing what plans for development, if any, may eventually materialize." *Kempthorne*, 457 F.3d at 977. Indeed, it is hard to understand how conducting a new NEPA analysis for every NPR-A lease sale (as SILA's and CBD's arguments would require) would allow BLM to identify and analyze alternatives that are any more "site-specific." The 2020 EIS evaluated alternatives covering a range of leasing from 10.9 to 18.7 million acres. BLM_000048-49. The 2026 Lease Sale offered 5.4 million acres, out of which 1.3 million acres of leases were awarded. BLM had no better way in 2026 to identify alternatives to and evaluate the potential impacts of a 5.4-million-acre sale (24% of which resulted in leases) than it did in 2020 for a range of 10.9 to 18.7 million acres. The results of NPR-A lease sales (and subsequent exploration and development activities) are unpredictable, and this

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG
- 30 -

is why BLM evaluated the impacts of *all* leasing authorized under the 2020 IAP in a single comprehensive EIS that included five alternatives *before* any leasing took place.

Thus, BLM reasonably and lawfully "did not produce any new NEPA analysis for the 2026 lease sale, including any NEPA assessment of alternatives to that sale." CBD Br. at 18. Under the binding precedent discussed above, the NEPA analysis was already conducted in the 2020 EIS, which evaluated four action alternatives, all of which contemplated future lease sales. BLM_000048-49. The 2020 EIS was updated by the 2025 EA, which "tier[ed] to and incorporate[d] by reference the 2020 IAP/EIS." BLM_22760-61. As the Ninth Circuit stated in *NAEC*, "the dispute here is not whether an EIS *must* be prepared for the leases, but whether an EIS has *already* been prepared for the leases." 983 F.3d at 1087 (emphases in original). Here, as in *NAEC*, that EIS (the 2020 EIS) has already been prepared.

Not to be deterred by the law or pragmatism, CBD insists that BLM could have constructed an entirely new range of alternatives by preparing *another* "hypothetical development scenario approach" for *each* lease sale (CBD Br. at 22)—on top of the hypothetical development scenario BLM already evaluated in the 2020 EIS's four action alternatives. CBD does not, and cannot, explain how that would make BLM's range of alternatives or effects analysis more specific, let alone more efficient. Assuredly, such inefficiency and delay is exactly what the Supreme Court decisively ended in *Seven*

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG

*County*: "A 1970 legislative acorn has grown over the years into a judicial oak that has hindered infrastructure development 'under the guise' of just a little more process." 605 U.S. at 184 (citation omitted). "NEPA is not a 'game' where project objectors can engage in 'unjustified obstructionism,'" causing "more agency analysis of separate projects, more consideration of attenuated effects, more exploration of alternatives to proposed agency action, more speculation and consultation and estimation and litigation." *Id.* at 184, 190 (citation omitted).

Plaintiffs ignore *Seven County*, instead relying on earlier cases that failed to apply the deference mandated by the Supreme Court. But Plaintiffs cannot ignore the "course correction" required by *Seven County* "to bring judicial review under NEPA back in line with the statutory text and common sense." *Seven County*, 605 U.S. at 184. "After *Seven County*, the era of searching NEPA review is over—or at least it should be." *Sierra Club v. Federal Energy Regulatory Comm'n*, 153 F.4th 1295, 1311 (D.C. Cir. 2025).

Besides, Plaintiffs' pre-*Seven County* cases do not help them, as neither *Cook Inletkeeper v. U.S. Dep't of the Interior*, 740 F. Supp. 3d 767 (D. Alaska 2024) nor *Western Watersheds Project v. Abbey*, 719 F.3d 1035 (9th Cir. 2013) supports their arguments. CBD Br. at 19-20; SILA Br. at 34-35. In *Cook Inletkeeper*, this Court struck down the alternatives analysis because of the agency's overly restrictive interpretations of the EIS's purpose and need statement, OCSLA, and the Cook Inlet leasing program. 740

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG
- 32 -

F. Supp. 3d at 784. The 2020 EIS and 2025 EA do not suffer from those flaws. Moreover, as explained above, the Ninth Circuit already affirmed that site-specific analysis is not necessary at the leasing stage for NPR-A lease sales. *Kempthorne*, 457 F.3d at 976-77; *NAEC*, 983 F.3d at 1089-90. *Western Watersheds* is inapt because it deals with cattle grazing under Federal Land Policy and Management Act ("FLPMA") multiple-use planning and, in any event, predates the on-point *NAEC* decision (as well as *Seven County*). *See* 719 F.3d at 1038-39.

In sum, Plaintiffs' claims fail under *Kempthorne* and *NAEC*, and *Seven County* confirms that BLM's approach is entitled to substantial deference. *See* 605 U.S. at 180-82; *see also Cascadia Wildlands v. BLM*, 153 F.4th 869, 902-05 (9th Cir. 2025) (applying *Seven County* standards when rejecting NEPA claims, including argument that NEPA analysis was "insufficiently site-specific"); *Sierra Club*, 153 F.4th at 1305-09, 1310-11 (rejecting NEPA claims in challenge to natural gas pipeline, quoting *Seven County*'s reminder that "'[d]eference' . . . is a 'bedrock principle of judicial review in NEPA cases'" (citation omitted)).

> **2. SILA's challenge to the 2025 EA's "purpose and need" statement is meritless.**

BLM also has "considerable discretion to define the purpose and need." *N. Cascades Conservation Council v. U.S. Forest Serv.*, 136 F.4th 816, 826 (9th Cir. 2025). SILA nonetheless faults BLM's "purpose and need" statement as "pro-development" and

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG
- 33 -

Case 3:26-cv-00097-SLG    Document 99    Filed 07/14/26    Page 46 of 80

failing to account for "FLPMA's multiple-use or other [unidentified] mandates" in the NPR-A. SILA Br. at 36-37. These objections should be rejected for at least the following reasons.

*First*, although it is unclear what SILA means by "pro-development," what is clear is that Congress established the NPR-A to meet the "total energy needs of the Nation" and mandated "an expeditious program of competitive leasing" to "encourage the greatest ultimate recovery of oil or gas." Pub. L. No. 94-258, 90 Stat. 303 (1976); Pub. L. No. 96-514, 94 Stat. 2957, tit. I (1980); 42 U.S.C. § 6506a(a). The "primary statutory directive" in the NPRPA is "to expeditiously pursue an oil and gas leasing program and to authorize exploration of, and production from, the reserve." 90 Fed. Reg. at 51,477. Congress identified no other "uses" for the Petroleum Reserve, but it did require exploration activities in certain areas to be subject to the "maximum protection" standard and generally gave BLM discretion to impose measures to mitigate significant impacts on surface resources. Still, these mitigation requirements are "subordinate" to the Act's primary purpose. *Id.*; *see also* 42 U.S.C. § 6504(a) (applying maximum protection to exploration activities, but only "to the extent consistent with the requirements of this Act for the exploration of the reserve"). BLM's purpose and need statement is fully consistent with the Petroleum Reserves Act's purpose and standards.

*Second*, SILA reads too much into the 2025 EA's purpose and need statement. As the last part of that statement says, the 2025 EA simply "evaluates new circumstances and information that have arisen since the publication of the 2020 IAP/EIS to ensure that the environmental analysis previously conducted is sufficient or is updated and expanded upon, as appropriate." BLM_022758. The 2025 EA "tier[ed] to and incorporate[d] by reference the 2020 IAP/EIS" and identified the 2020 EIS's alternatives. *See* BLM_22760-61. The 2026 Lease Sale was fully within the scope of the alternatives and associated effects analyzed in the 2020 EIS. And SILA has no complaint about the 2020 EIS purpose and need statement or the range of alternatives evaluated in the 2020 EIS.

*Third*, SILA claims that even though Congress prohibited BLM from preparing FLPMA multiple-use resource management plans for the NPR-A, BLM was still somehow required to "account" for the FLPMA multiple-use "mandate." SILA Br. at 37-38. This does not pass even the most generous straight-face test. To facilitate its intent to "expeditiously increas[e] the nation's oil production," *SILA v. BLM*, 555 F. Supp. 3d 739, 758 (D. Alaska 2021), Congress expressly prohibited BLM from managing the NPR-A under FLPMA because such planning "inhibit[s] expeditious leasing." H.R. Rep. No. 96-

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG
- 35 -

1147 at 33 (1980). Congress plainly did not want BLM to waste time contemplating how to "account" for FLPMA standards it was not required to follow. [10]

BLM's purpose and need statement reasonably reflects the action before it and Congress's repeated mandate to implement an expeditious leasing program. SILA's claim should be denied.

**C. BLM Was Not Required to Provide an Additional "Explanation" for the 2026 Lease Sale.**

NEPA—not the NPRPA—requires BLM to identify and evaluate alternatives. BLM did so here and explained its leasing decisions in the 2020 IAP ROD and the 2025 IAP ROD, based on the 2020 EIS and 2025 EA. For the reasons stated above, that approach was entirely lawful. But, knowing its re-re-packaged NEPA argument is likely to fail, CBD tries to camouflage that argument as a stand-alone Administrative Procedure Act ("APA") challenge, claiming that BLM failed to explain why it selected each tract for the 2026 Lease Sale. CBD Br. at 22-26. Tellingly, CBD identifies no substantive law or regulation requiring such an additional "explanation," and CBD's claim fails.

The Court "need look no further than the statute's [and regulation's] plain language" to reject CBD's "parcel-by-parcel" APA claim. *Int'l Bhd. of Teamsters v. U.S.*

---

[10] Nor was BLM was required to account for the "maximum protection" standard, which applies only to "exploration" activities, not to "leasing" decisions. *See supra* Section III.A.5.

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG
- 36 -

*Dep't of Transportation*, 861 F.3d 944, 954 (9th Cir. 2017). The statute requires the Secretary to "conduct an expeditious program of competitive leasing of oil and gas." 42 U.S.C. § 6506a. BLM implements that directive through regulations. 43 C.F.R. part 3130.

Among other things, those regulations require BLM to gather information for a lease sale in response to a "call for nominations." *Id*. § 3131.2(a). The BLM State Director selects "tracts to be offered for sale" after completing the required environmental analysis, considering other specified categories of information, and identifying "measures to mitigate adverse impacts, including lease stipulations and information to lessees." *Id*. § 3131.2(b). BLM then publishes a "notice of sale," which "shall state the place and time at which bids are to be filed, and the place, date and hour at which bids are to be opened." *Id*. § 3131.4-1(a). Immediately after publication of the notice of sale, BLM must make available a "detailed statement of the sale," which must include "a description of the areas to be offered for lease, the lease terms, conditions and special stipulations and how and where to submit bids." *Id*. § 3131.4-1(c). The notice of sale and detailed statement of sale for the 2026 Lease Sale provide all required information. BLM_130693-790.

Under the OBBB Act, the tracts offered by BLM must fall within the lands identified as open to leasing under the 2020 IAP, which was informed by the comprehensive 2020 EIS, and be subject to the stipulations and conditions set forth in the

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG
- 37 -

2020 IAP. Pub. L. 119-21, § 50105(a), (b), (d). Neither the NPRPA nor BLM's implementing regulations require BLM to prepare an additional "explanation" for why particular tracts were selected to be offered the 2026 Lease Sale. Indeed, not a single lease sale dating back to 1999 has included any such explanation in the notice of sale or the detailed statement of sale.[11] And reading § 3131.2(b) to require the tract-by-tract explanation CBD demands would impermissibly add a requirement that neither the statute nor the regulation contains. *See Int'l Bhd. of Teamsters*, 861 F.3d at 954 ("Given that § 6901(a)(2) expressly describes the substantive requirements with which the Secretary must comply in conducting the pilot program, we reject the Teamsters' invitation to find an implied requirement of statistical validity in the 2007 Act's other provisions.").

Besides, even if some additional explanation were required (and it is not), Plaintiffs fail to provide a "reason to believe" that such an explanation would result in a different set of lands being offered for lease. *Seven County*, 605 U.S. at 185 (procedural deficiencies do not warrant vacatur "absent reason to believe that the agency might disapprove the project if it added more to the EIS"). To the contrary, BLM picked from the lands required by Congress and did so after receiving nominations from the oil and

---

[11] *See* BLM, *Alaska Oil and Gas Lease Sales*, https://www.blm.gov/programs/energy-and-minerals/oil-and-gas/leasing/regional-lease-sales/alaska (last visited July 14, 2026).

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG

gas industry. It would make little sense to vacate a $163 million lease sale that was mandated by Congress just so BLM can provide another explanation for why it made the obvious choices it did here.

Ultimately, BLM fully complied with the statute and its regulations for the 2026 Lease Sale. CBD's claim that BLM failed to comply with a non-existent parcel-by-parcel "explanation" requirement should be rejected. *Int'l Bhd. of Teamsters*, 861 F.3d at 955 ("[A]rbitrary and capricious review does not apply in the absence of a statutory benchmark against which to measure an agency's exercise of discretion.").

**D. The Court Should Reject CBD's Nitpicking of FWS's Programmatic Biological Opinion.**

CBD challenges the U.S. Fish and Wildlife Service's ("FWS") programmatic biological opinion ("BiOp") on multiple grounds, nitpicking FWS's scientific determinations and complaining that FWS refrained from speculating about unknown effects. These claims contradict the record and misunderstand the ESA's requirement that FWS must base its decisions on "the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2). That requirement is an "empirical mandate" established by Congress to "ensure[] the law is not 'implemented haphazardly, on the basis of speculation or surmise,' and thus 'avoid[s] needless economic dislocation produced by agency officials zealously but unintelligently pursuing their environmental objectives.'" *Maine Lobstermen's Ass'n v. NMFS*, 70 F.4th 582, 595 (D.C. Cir. 2023) (quoting *Bennett v.*

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG
- 39 -

*Spear*, 520 U.S. 154, 176-77 (1997)). In other words, the best available data requirement forbids precisely what CBD argues FWS should have done—*i.e.*, speculate about effects.

CBD's claims also overlook that the BiOp is *programmatic*, meaning that the effects analysis is necessarily "more generalized" because FWS "does not have specific information about the number, location, timing, frequency, precise methods, and intensity of the site-specific actions or activities for their program." 89 Fed. Reg. 24,268, 24,274 (April 5, 2024). FWS conducts ESA analyses for future, on-the-ground activities in the NPR-A through the more detailed "step-down consultation" process. *See* FWS2025_00440; FWS2025_00443. CBD does not object to FWS's decision to conduct a programmatic consultation.

For these reasons, addressed in more detail below, the Court should deny CBD's ESA claims.

**1. FWS appropriately considered and analyzed terrestrial denning dynamics.**

CBD first argues that FWS "fail[ed] to account for the projected increased rate of [polar bear] terrestrial denning during the life of the 2025 IAP." CBD. Br. at 34. Initially, this argument is factually wrong. FWS expressly acknowledged that (1) "loss of sea ice due to climate change" has led to an "increase in land-based denning," (2) there is "an increasing trend in the number of bears using Terrestrial Denning Habitat," and (3) there is an "increase in the number of dens in the NPR-A over time." FWS2025_00730-31;

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG

FWS2025_00734. FWS further explained that it was "unable to predict those changes over a 70-year period," and, therefore, its "estimates of the number of dens potentially impacted could be low." FWS2025_00734. FWS plainly did "account for" potential increases in land-based denning.

CBD's real complaint is that FWS allegedly "could have," but did not, use "modeling for decreased sea ice" to speculate about the rates and locations of future dens. CBD Br. at 35. But this would have violated the ESA's best-available-data mandate, which prevents agencies from engaging in "speculation or surmise." *Bennett*, 520 U.S. at 176. Moreover, the mere existence of a model does not obligate FWS to use the model in a way it deems inappropriate. *See Nat. Res. Def. Council v. Haaland*, 102 F.4th 1045, 1067 (9th Cir. 2024) ("The decision as to what constitutes best available science is one that belongs to the agency's special expertise." (internal quotation marks and citation omitted)); *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 620 (9th Cir. 2014) (agency not required to "conduct the perfect study" (citation omitted)). CBD's terrestrial denning claim should be rejected.

**2. FWS appropriately considered and analyzed polar bear population dynamics.**

Next, CBD argues that FWS "arbitrarily failed to account for the future decline of polar bears in the action area during the life of the 2025 IAP." CBD Br. at 37. This claim

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG
- 41 -

is also factually wrong—FWS did "account for" future polar bear population dynamics—and should be rejected.

For example, FWS explained why it is difficult to accurately estimate polar bear subpopulation sizes and trends, including those of the Chukchi Sea ("CS") and Southern Beaufort Sea ("SBS") subpopulations that occur in the action area. FWS2025_00492; FWS2025_00563. The BiOp specifically explains that "[p]olar bear researchers . . . have not recorded a linear relationship between the amount of sea ice lost and impacts to polar bears" and that "multiple papers suggest that polar bears are adjusting their distribution as a result of sea ice loss . . . suggest[ing] a more complicated response to sea ice loss by polar bears rather than a linear one." FWS2025_00723.

Additionally, the pessimistic projections made 18 years ago in the study CBD relies upon have not borne out. CBD Br. at 37-38 (citing FWS2025_02399-454). CBD seizes upon that study's prediction of an 80% probability of polar bears in the polar basin divergent ecoregion going extinct by 2045-54. FWS2025_02411. But that study also predicted a 45% probability of extinction by years 2020-29, with only a 2% probability of the population remaining the same by that time. FWS2025_02411. And yet, the polar bear population is estimated to be higher now than when it was listed in 2008. *See* FWS2025_00734 ("current global population for polar bears is approximately 26,000 individuals"); *see also* 73 Fed. Reg. 28,212, 28,215 (May 15, 2008) (estimating polar

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG

bear species at "20,000-25,000 in total population"). FWS also finds that the SBS subpopulation has remained steady since 2010 and the CS subpopulation has likely been stable with capacity for positive population growth despite sea ice loss due to the subpopulation's good body condition and reproduction. FWS2025_00492; FWS2025_00568.

FWS considered all relevant information about polar bear population dynamics; CBD just disagrees with FWS's analysis and conclusions and invites the agency to improperly speculate about future population dynamics. That is no basis to fault the BiOp. *Trout Unlimited v. Lohn*, 559 F.3d 946, 958 (9th Cir. 2009) ("An agency's decision may [still] be based on the best scientific evidence available even if the administrative record contains evidence for and against its decision."); *Native Vill. of Chickaloon v. Nat'l Marine Fisheries Serv.*, 947 F. Supp. 2d 1031, 1067 (D. Alaska 2013) (rejecting ESA claim because plaintiffs "failed to show that the dispute . . . is anything other than a disagreement over the interpretation of the available scientific evidence").

3.  **CBD's complaints about FWS's modeled female cub mortality estimates are baseless.**

CBD delves even deeper into the weeds, taking issue with FWS's assumption that "mortalities of female cubs caused by the 2025 IAP 'would be minimized' because mother bears who lose their cubs during denning season will be available to breed again

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG
- 43 -

in the spring of that year and produce cubs in the next denning season." CBD Br. at 39 (quoting FWS2025_00733). CBD criticizes this assumption as "fail[ing] to account" for multiple pieces of "record evidence." These claims are baseless.

*First*, FWS did not "fail to account" for anything. Indeed, every piece of "evidence" CBD claims FWS failed to account for is in FWS's administrative record and was, therefore, considered. *See*, *e.g.*, FWS2025_00493; FWS2025_630-33; FWS2025_640-41; FWS2025_732-34; *see also Nat. Res. Def. Council*, 102 F.4th at 1067 ("[T]o succeed on a best-available-science claim, a plaintiff must not only identify relevant scientific evidence that the agency ignored, but show that it 'is in some way better than the evidence [the agency] relies on.'").

*Second*, CBD, again, just disagrees with FWS's scientific conclusions. FWS acknowledged that the supposed loss of female cubs could marginally decrease the reproductive population over the long term but that "such effects would be minimized by the additional reproductive opportunities that accrue to any adult females that lose their litters" because cubs lack reproductive value until they are four to five years of age. FWS2025_00733. FWS explained that high adult survival rates, particularly of adult females, are the primary driver for maintaining polar bear populations "[d]ue to extended maternal care of young and low reproductive rates." *See* FWS2025_00493. FWS's conclusions are reasonable and explained.

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG
- 44 -

*Third*, the supposed "female cub mortalities" are nothing more than the hypothetical results of a model that has been demonstrated to significantly overestimate impacts and produce results that are inconsistent with the best available data. *See* FWS2025_42761-71; FWS2025_42772-82. In fact, over almost 30 years of rigorous monitoring and reporting of polar bear observations on the North Slope, *not a single* polar bear cub mortality caused by industry activities has ever been observed. *See* FWS2025_42765-66. That is due, in part, to industry's implementation of an extensive suite of avoidance and minimization measures that have repeatedly been found—by agencies and courts—as effective. *See CBD v. Salazar*, 695 F.3d 893, 908 (9th Cir. 2012) (the "overall record supports [FWS's] conclusion that the [polar bear] mitigation and monitoring measures are effective"); *see* FWS2025_00731 ("Impacts have been limited to minor and temporary effects to polar bears that did not result in the injury or death of any individuals."). Adding to the model's conservative bias, FWS evaluated the "most impactful development scenario" and assumed that all future development would occur within polar bear terrestrial denning habitat while acknowledging that "this scenario is unlikely and has not been observed in practice to date in the Action area or in other industrial developments on the North Slope of Alaska." FWS2025_00632; *see also* FWS2025_00641.

FWS more than accounted for the extremely remote potential of female cub mortality in the BiOp. If anything, FWS should be faulted for speculating about impacts that are unlikely to occur and have never been observed. *See Maine Lobstermen's Ass'n*, 70 F.4th at 586 (holding that agency may not, "when faced with uncertainty, give the 'benefit of the doubt' to an endangered species by relying upon worst-case scenarios or pessimistic assumptions"). CBD's claim should be rejected.

### 4. The BiOp's reliance on well-established mitigation measures is reasonable and lawful.

Lastly, CBD claims FWS unlawfully relied on "uncertain and nonbinding mitigation measures" in the BiOp. CBD Br. at 40. Specifically, CBD argues that FWS unreasonably assumed that a "required operating procedure" included in the IAP—"ROP C-1"—would be implemented. This claim is also baseless, for at least the following reasons.

### a. CBD's claim fails because it is based on inapplicable law.

At the outset, CBD appears to believe that the Court should review the BiOp for compliance with the 2018 ESA regulations, presumably because, on March 30, 2026, a district court vacated the 2019 ESA regulations (in part) and reinstated the 2018 ESA regulations (in part). *See* CBD Br. at 40 (citing 2018 ESA regulations and *CBD v. U.S. Dep't of Interior*, Case No. 24-cv-04651-JST, 2026 WL 898264, at *16 (N.D. Cal. Mar. 30, 2026)). But courts review agency action based on the "regulations effective at

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG
- 46 -

the time" of the agency action. *Env't Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1017 (9th Cir. 2006); *Native Ecosystems Council v. Tidwell*, 599 F.3d 926, 932 (9th Cir. 2010) (applying the "[r]egulations implementing the statute, in effect at the time the Forest Service issued its final decision"). That general rule makes even more sense here because the district court decision vacating the 2019 ESA regulations (in part) has been appealed and is itself subject to reversal. *See Sierra Club v. U.S. Dep't of Interior*, No. 26-3543 (9th Cir., filed May 29, 2026). Judicial review under the APA's "arbitrary and capricious" standard is fixed by the law at the time the agency acted, not on the shifting sands of subsequent judicial determinations presently on appeal.

The BiOp was issued in July 2025 and, accordingly, is governed by the 2019 ESA regulations applicable at that time. Under those regulations, FWS was not obligated to demonstrate that applicable mitigation measures are "binding." *See* 50 C.F.R. § 402.14(g)(8) (2019) ("Measures included in the proposed action or a reasonable and prudent alternative that are intended to avoid, minimize, or offset the effects of an action are considered like other portions of the action *and do not require any additional demonstration of binding plans*." (emphasis added)); 84 Fed. Reg. 44,976, 44,979-80, 45002-03 (Aug. 27, 2019) (discussing changes to § 402.14(g)(8)). Under those regulations, CBD's claim fails.

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG
- 47 -

Case 3:26-cv-00097-SLG    Document 99    Filed 07/14/26    Page 60 of 80

### b. Regardless of what regulations apply, ROP C-1 is both binding and certain.

Even if the 2018 ESA regulations applied here, CBD's claim still fails because ROP C-1 is both binding and certain. ROP C-1 requires that lessees "must make efforts to locate occupied polar bear dens within and near areas of operation, *utilizing den detection techniques approved by the Service*." FWS2025_00481 (emphasis added). This measure is a "required" element of the proposed action that "BLM will impose on applicants during the permitting process." FWS2025_00481; BLM_024573; *see* BLM_130702 ("[t]he tracts offered in this sale are subject to stipulations and required operating procedures established by the 2025 NPR-A IAP ROD"); *see also* BLM_130756-57; BLM_024540; BLM_024591-92. It is subject to modification only under specific, strict criteria, which are considered in the BiOp. *See* FWS2025_00477; FWS2025_00480.

This situation is nothing like the cases CBD relies upon. *CBD v. Bernhardt* involved a challenge to the Bureau of Ocean Energy Management's authorization of the "Liberty" oil development project off Alaska's North Slope. 982 F.3d 723, 744 (9th Cir. 2020). FWS prepared a biological opinion for that project, and the Ninth Circuit found fault with the opinion's reliance on separate Marine Mammal Protection Act ("MMPA") authorizations that had not yet been issued and, if and when issued, would only cover a period of five years (not the life of the project). *Id.* By contrast, ROP C-1 is *expressly part of BLM's action*, is binding on any lessee that purchases a lease in the NPR-A, must

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG
- 48 -

be included in BLM's authorization of projects on NPR-A leases, and is not dependent upon future authorizations under the MMPA (or any other statute). *See* BLM_024572-73; BLM_130702; BLM_130756-57.

*CBD v. Salazar*, 804 F. Supp. 2d 987 (D. Ariz. 2011), is similarly inapt. That case involved a FWS biological opinion addressing the effects of annual river water withdrawals for a massive military project in Arizona. The court faulted FWS's "no jeopardy" determination for depending on a "laundry list" of 26 water conservation projects, some of which were "conceptual in nature only and may be altered, replaced, or abandoned" and only nine of which were actually funded. *Id* at 1002. The court concluded that those conceptual projects reflected only a "commitment to develop a plan to mitigate" and were not "identified and included in the BiOp" or "incorporated into the Army's proposed action." *Id*. at 1004 (citation omitted). None of those flaws are present here.

*National Wildlife Federation v. National Marine Fisheries Service* is likewise distinguishable. 524 F.3d 917 (9th Cir. 2008). That case involved (and still involves) a long-running dispute over the ongoing operations of the Federal Columbia River Power System for which the National Marine Fisheries Service ("NMFS") reached a "jeopardy" determination and issued a reasonable and prudent alternative ("RPA"). To support its "no jeopardy" conclusion for the RPA, NMFS relied upon the "future installation of

Removable Spillway Weirs (a type of surface bypass collector) and other structural improvements to aid safe passage." *Id*. at 935. But the record showed only "a general desire to install structural improvements where feasible" and not a "clear, definite commitment of resources for future improvements." *Id*. at 936. Here, however, ROP C-1 does not reflect BLM's "general desire"—it is a *required* element of the proposed action.

Finally, CBD faults the BiOp's effects analysis for assuming that the "den detection techniques" required to be employed under ROP C-1 would consist of aerial infrared ("AIR") surveys. But that assumption was entirely reasonable and is entitled to deference. *See NAEC*, 361 F. Supp. 2d at 1084 ("Deference to an agency's technical expertise and experience is particularly warranted with respect to questions involving engineering and scientific matters.") (quoting *U.S. v. Alpine Land & Reservoir Co.*, 887 F.2d 207, 213 (9th Cir. 1989)). Any action carried out under the IAP must employ "den detection techniques approved by the Service" and, therefore, FWS had to account for that requirement in its effects analysis.[12] To do so, FWS reasonably assumed that those "techniques" would likely consist of the same AIR surveys that have been carried out year-after-year, for decades, for virtually every project on the North Slope.

---

[12] CBD thinks it is not enough that lessees "must make efforts to locate occupied polar bear dens." CBD Br. at 40-41. CBD misreads the requirement. ROP C-1 states that those efforts *must* be made by "utilizing den detection techniques approved by the Service." FWS2025_00481.

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG

FWS2025_00612; FWS2025_00620 (discussing "thousands of hours of AIR surveys conducted in northern Alaska over the last decade"). CBD identifies no other "den detection technique" that FWS should have considered in its effects analysis. To be sure, had FWS elected *not* to assume that ROP C-1 would be implemented, then (1) FWS's effects analysis would have been factually incorrect (since ROP C-1 is required) and (2) the "unlikely" effects of the "most impactful development scenario" evaluated by FWS would have been even more exaggerated and more "unlikely." FWS2025_00641.

In sum, CBD's challenge to ROP C-1 should be rejected because it is premised on inapplicable law. Alternatively, it should be rejected because ROP C-1 is binding and certain.

## E. BLM Reasonably Relied on the Existing ANILCA Section 810 Evaluation Conducted for the 2020 IAP.

SILA claims BLM violated ANILCA by relying on the Section 810 evaluation it prepared for the 2020 IAP, arguing that "[r]eliance on the 2020 Section 810 evaluation to fulfill BLM's obligations when adopting the 2025 IAP is not an option under the statute." SILA Br. at 24-29. But SILA cites no authority showing that reliance on an existing Section 810 evaluation to support a subsequent action is "not an option" for an agency. An agency certainly has that option, and BLM reasonably used that option and explained why. SILA's claim should be rejected.

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG

Courts often turn to NEPA case law to interpret ANILCA Section 810 requirements due to the similarities between the procedural requirements of NEPA and ANILCA. *See Se. Alaska Conservation Council v. U.S. Forest Serv.*, 443 F. Supp. 3d 995, 1016-17 & n.172 (D. Alaska 2020) (collecting cases). Much like NEPA, "[t]he purpose of [Section 810] is to promote informed decision-making, such that the impacts of an action to subsistence activities are considered." *Id*. at 1017.

Under NEPA, "the standard that governs an agency's decision whether to prepare a supplemental EIS . . . [is] that an agency should apply a rule of reason." *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 373 (1989) (internal quotation marks omitted). "[I]f the new information is sufficient to show that the remaining action will 'affec[t] the quality of the human environment' in a significant manner or to a significant extent not already considered, a supplemental EIS must be prepared." *Id.* at 374. At the same time, "an agency need not supplement an EIS every time new information comes to light after the EIS is finalized." *Id*. at 373.

As addressed *supra*, the 2025 IAP relies on the 2020 EIS and adopts Alternative E from the 2020 IAP. *See supra*, Section II.E. The 2025 IAP does not establish a new management framework nor does it contemplate activities beyond those analyzed in the 2020 EIS. A key purpose of the 2025 EA was to "evaluate[] new circumstances and information that have arisen since the publication of the 2020 IAP/EIS to ensure that the

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG
- 52 -

environmental analysis previously conducted is sufficient or is updated and expanded upon, as appropriate." BLM_022758. BLM performed a detailed evaluation that is documented in Appendix A to the 2025 EA. BLM_022781-99. There, BLM describes the meticulous process it undertook to evaluate new information, summarizes the new information and findings applicable to 29 elements of the environment, and documents its conclusions. *Id.* Ultimately, BLM concluded that greenhouse gas emissions was the only issue that needed to be "carr[ied] forward for detailed analysis . . . on the basis of new information and guidance," and that "[f]or all other resource issues reviewed, the BLM determined that there either was no new information or circumstances, or such new information or circumstances would not substantially change the analysis conducted in the 2020 IAP/EIS." BLM_022825.

BLM relied upon that analysis for its ANILCA Section 810 evaluation, which is presented in Appendix B to the 2025 EA. BLM_022800-06. There, BLM documents the reasons why it relied on the Section 810 evaluation prepared for the 2020 IAP and explains that it "considered whether there is any new information or circumstances which have arisen since the publication of the 2020 IAP/EIS which would substantially alter the findings made in the existing ANILCA Section 810 Evaluation." BLM_022806. BLM concludes:

> As detailed in Appendix A of [the 2025 EA], while new information was identified for each of these resource areas, it

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG
- 53 -

> would not substantially change the analysis or conclusions as provided for in the 2020 IAP/EIS. For this same reason, the BLM concludes that the evaluation, findings and determinations made under the existing ANILCA Section 810 Evaluation would not substantially change from those previously disclosed in Appendix E of the 2020 IAP/EIS. On this basis, the BLM concludes that the existing ANILCA Section 810 Evaluation prepared in support of the 2020 IAP/EIS remains adequate and valid for the Ped Action.

*Id.* SILA fails to explain why BLM's conclusion was wrong or to otherwise identify any part of the analyses in the 2025 EA, Appendix A, or Appendix B that it believes was arbitrary or capricious.

SILA does cite to *Alaska Wilderness Recreation and Tourism Association v. Morrison*, 67 F.3d 723 (9th Cir. 1995), but provides no explanation for why that case supports SILA's (otherwise unsupported) arguments. SILA Br. at 28. And, indeed, it does not. There, the Ninth Circuit considered whether the U.S. Forest Service ("Forest Service") was required under NEPA and ANILCA to conduct an additional environmental review following the termination of a contract with a timber company, Alaska Pulp Corporation. *Alaska Wilderness*, 67 F.3d at 726. In so doing, the court analyzed *both* the NEPA and ANILCA claims—together, in the same analysis—under NEPA's supplementation standard. *Id.* at 727-31.

The Ninth Circuit ultimately held that the Forest Service violated NEPA and ANILCA for failing to prepare a supplemental EIS when "elimination of the contract

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG
- 54 -

appears significantly to alter the range of viable alternatives available to the Forest Service." *Id.* at 731. But, unlike the Forest Service, BLM here prepared a new EA, performed detailed evaluations of new information for both NEPA and ANILCA purposes, and concluded that the "evaluation, findings and determinations made under the existing ANILCA Section 810 Evaluation would not substantially change from those previously disclosed." BLM_022806. This is far cry from circumstances that "significantly . . . alter the range of viable alternatives" and, again, SILA identifies nothing in BLM's reasoned analysis to suggest otherwise. *See Alaska Wilderness*, 67 F.3d at 731. The Court should reject SILA's unsupported ANILCA claim.

**F. GGG Lacks Standing to Challenge the Cancellation Notice.**

GGG challenges the cancellation of the Teshekpuk Lake Conservation Right-of-Way (the "Right-of-Way") issued to Nuiqsut Trilateral, Inc. ("Nuiqsut Trilateral") by BLM (the "Cancellation Notice"). GGG Br. at 12-18. But the Right-of-Way belongs to Nuiqsut Trilateral, not GGG. GGG has no standing to challenge the cancellation of a right-of-way that belongs to someone else. The Court therefore lacks jurisdiction to review GGG's claims related to the Right-of-Way.

A plaintiff bears the burden to prove standing at summary judgment and must demonstrate standing for *each claim* asserted. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). "[T]he standing

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG

question is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth v. Seldin,* 422 U.S. 490, 498-99 (1975). To establish Article III standing, a plaintiff must satisfy three irreducible constitutional minimum requirements: (1) he or she suffered an injury-in-fact, which is an invasion of a legally protected interest that is concrete, particularized, and actual or imminent; (2) the injury is fairly traceable to the challenged conduct; and (3) the injury is likely to be redressed by a favorable court decision. *Lujan*, 504 U.S. at 560-61; *see also Nat. Res. Def. Council v. EPA*, 542 F.3d 1235, 1244 (9th Cir. 2008).

In addition to these bedrock requirements, "a party generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (internal quotation marks omitted) (citing *Warth*, 422 U.S. at 499); *see also Mills v. U.S.*, 742 F.3d 400, 407 (9th Cir. 2014) ("Courts 'typically decline to hear cases asserting rights properly belonging to third parties rather than the plaintiff.'" (citation omitted)). "This rule assumes that the party with the right has the appropriate incentive to challenge (or not challenge) governmental action and to do so with the necessary zeal and appropriate presentation." *Kowalski*, 543 U.S. at 129. A limited exception exists. A court will allow standing to assert the rights of a third party if there is (1) a "'close' relationship with the person who

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG
- 56 -

possesses the right" and (2) some "hindrance" to the possessor's ability to "protect his own interests." *Id*. at 130.

Accordingly, courts have commonly found that third parties lack standing to enforce the property rights of others, absent that exception being met. For example, in *The Wilderness Society v. Kane County*, the court dismissed a challenge involving a right-of-way because the third-party plaintiff (who is also a plaintiff in this case) "obviously seeks to enforce the federal government's property rights in the disputed rights of way." 632 F.3d 1162, 1171 (10th Cir. 2011). Similarly, in *Kalorama Citizens Association v. SunTrust Bank Company*, the court dismissed a challenge involving a public easement because the plaintiff's "claim rests on the legal rights of a third party, namely, the District of Columbia" who was the putative holder of the easement. No. CV 18-528 (BAH), 2020 WL 5653695, at *10 (D.D.C. Sept. 23, 2020). Many other courts have concluded the same. *See*, *e.g.*, *Petroleum Power Int'l Corp. v. Hidden Passage, LLC*, No. 5:21-CV-00028-JWH-SP, 2024 WL 1825436, at *5 (C.D. Cal. Mar. 27, 2024) (plaintiff lacks standing because it "seeks to enforce only the alleged easement rights of Petroleum Power, not those of [plaintiff]"); *Church of Universal Bhd. v. Farmington Twp. Sup'rs*, 296 F. App'x 285, 288-89 (3d Cir. 2008) (plaintiffs failed to allege an injury-in-fact to establish Article III standing in condemnation action in which plaintiffs lacked ownership interest in the property at issue); *Kakarala v. Wells Fargo*

*Bank, N.A.*, No. CV-10-00208-TUC-FRZ, 2012 WL 1458235, at *8 (D. Ariz. Apr. 27, 2012) ("Plaintiff is merely an uninvolved and unaffected third-party borrower . . . [who] lacks standing to challenge [a company's] assignment of the deed of trust to Wells Fargo because she was not a party to the assignment." (citation modified)); *FiberLight, LLC v. Nat'l R.R. Passenger Corp.*, 81 F. Supp. 3d 93, 109-11 (D.D.C. 2015) (court lacked jurisdiction to review claims brought by a non-signing party to a right-of-way agreement who failed in part to establish third-party standing).

Here, GGG lacks standing to challenge the Cancellation Notice because neither it nor its members possess any legally protected interest in the Right-of-Way. The Right-of-Way identifies Nuiqsut Trilateral and its successors, heirs, and assigns, and the United States of America and its assigns, as the only parties to the Right-of-Way. ROW_02250. GGG does not assert that it is part of the Nuiqsut Trilateral or that it has any legal ownership or other rights in Nuiqsut Trilateral's Right-of-Way. GGG has no standing to claim "relief on the legal rights or interests of third parties." *Kowalski*, 543 U.S. at 129 (quoting *Warth*, 422 U.S. at 499).

GGG also fails to meet the narrow exception for third-party standing. GGG identifies no relationship between Nuiqsut Trilateral and GGG. And obviously, there is no "hindrance" to Nuiqsut Trilateral asserting its own rights, as it is presently doing so in this Court in a separate proceeding and has secured a preliminary injunction against the

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG

Cancellation Notice. *Nuiqsut Trilateral, Inc. v. Burgum*, No. 3:26-CV-00098-SLG, 2026 WL 734749, at *3 (D. Alaska Mar. 16, 2026). GGG wishes to pile onto that ongoing dispute but lacks standing to do so.

Tellingly, GGG fails to explain how it has standing to enforce Nuiqsut Trilateral's interests in its Right-of-Way. Instead, GGG generically states that its "members rely on the Reserve and the TLSA for subsistence, recreational, fish and wildlife, and historic scenic values" and have "harms tied to the use, occupancy, and resources of the lands at issue." GGG Br. at 6. But this just describes the rights afforded to Nuiqsut Trilateral by the Right-of-Way. ROW_2253-2256. GGG may view itself as a third-party beneficiary of the rights granted to Nuiqsut Trilateral, but the grant is clear that "this Grant is not intended, and shall not be construed, to create any third-party beneficiary hereof and that nothing in this Grant shall be construed as creating any rights of enforcement by any other person or entity that is not a party to this Grant." ROW_2258.

GGG may argue in reply that it is trying to protect its own conservation interest in the area encompassed by the Right-of-Way, not the interests of Nuiqsut Trilateral. But this is the same argument that was tried and failed in *Wilderness Society*, 632 F.3d at 1171. In that case, the Wilderness Society "argue[d] that it is not suing based on the legal rights of a third party, the federal government's property rights, but rather 'is working to protect its conservation interests.'" *Id.* The Court had no trouble seeing through that

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG
- 59 -

claim, explaining that the Wilderness Society's conservation interests were derivative of the federal government property rights and that the Wilderness Society "obviously seeks to enforce the federal government's property rights in the disputed rights of way." *Id*. The court further explained that the Wilderness Society "has taken sides in what is essentially a property dispute between two landowners, only one of which is represented (Kane County). But [the Wilderness Society] lacks any independent property rights of its own." *Id*. The court likened this scenario to a busybody neighbor:

> Imagine that my next-door neighbor, who keeps his property neat and tidy, is faced with a competing claimant to the land, who is likely to allow the property to fill with weeds. I might very much hope my neighbor wins. My property values and aesthetic interests could seriously be affected. I may be impatient with my neighbor's inclination toward compromise and apparent disinclination to go to court. But no one would say I have standing to sue in defense of my neighbor's property rights. The Wilderness Society is in precisely that situation.

*Id*. The court proceeded to dismiss the Wilderness Society for lack of standing.

The situation here is no different. GGG has taken sides in a property dispute in which GGG has no legal interest. GGG hopes Nuiqsut Trilateral will prevail because it hopes that the Nuiqsut Trilateral will manage the lands in a way preferred by GGG. But "no one would say" that GGG has "standing to sue in defense of" Nuiqsut Trilateral's property rights. *Id*. Indeed, GGG's effort to do so is especially inane given that Nuiqsut Trilateral is currently litigating to protect its own interests against BLM in a separate

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG
- 60 -

proceeding. GGG's claims related to the Right-of-Way should be dismissed for lack of standing.

**G.  Vacatur is Unwarranted.**

If the Court were to agree with one or more of Plaintiffs' claims, the appropriate remedy is remand without vacatur. Courts "are not mechanically obligated to vacate agency decisions that they find invalid." *Pac. Rivers Council v. U.S. Forest Serv.*, 942 F. Supp. 2d 1014, 1017 (E.D. Cal. 2013); *see also Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995) ("Although the district court has power to do so, it is not required to set aside every unlawful agency action."). "Whether agency action should be vacated depends on how serious the agency's errors are 'and the disruptive consequences of an interim change that may itself be changed.'" *Cal. Cmtys. Against Toxics v. U.S. EPA*, 688 F.3d 989, 992 (9th Cir. 2012) (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)). The Ninth Circuit has made clear that courts should consider economic and other practical concerns when determining whether vacatur is appropriate. *Id.* at 994.[13] Moreover, the Supreme Court recently cautioned that deficiencies in NEPA compliance "may not necessarily require a

---

[13] *Pac. Rivers*, 942 F. Supp. 2d at 1018 (rejecting vacatur, concluding "courts should consider economic and other practical concerns"); *see Cook Inletkeeper v. Raimondo*, 541 F. Supp. 3d 987, 993 (D. Alaska 2021) (rejecting plaintiffs' contention that "the primary consequences to be considered when assessing the disruptive impact of vacatur are environmental harms").

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG
- 61 -

Case 3:26-cv-00097-SLG     Document 99     Filed 07/14/26     Page 74 of 80

court to vacate the agency's ultimate approval of a project, at least absent reason to believe that the agency might disapprove the project if it added more to the EIS." *Seven County*, 605 U.S. at 185.

ConocoPhillips agrees with Federal Defendants that the parties can best address the *Allied-Signal* factors in the context of supplemental briefing, after the Court has identified a specific legal error (if any). That is especially true in this case because Plaintiffs have challenged a wide variety of overlapping and interlinked agency actions that are further complicated by multiple instances of congressional intervention. The appropriateness of vacatur, and the disruptive consequences of vacatur, necessarily turn on which agency action the Court finds invalid and the effect of vacating that action on other actions.

In the absence of such guidance, Plaintiffs address vacatur with a blunderbuss. They want vacatur of the 2020 IAP, 2020 EIS, 2025 IAP, 2025 EA, the BiOp, and the 2026 Lease Sale. But Plaintiffs' broadside approach ignores "the possibility of undesirable consequences which we cannot now predict that might result from invalidation of [the unlawful decisions]." *W. Oil & Gas Ass'n v. EPA*, 633 F.2d 803, 813 (9th Cir. 1980).

For example, if the 2025 IAP and 2020 IAP are vacated, that could unravel decades of planning and protections in the NPR-A. That is so because the 2022 IAP was

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG
- 62 -

nullified by Congress and, thus, neither the 2022 IAP nor the 2013 IAP (which is "substantially the same" as the 2022 IAP) can be reactivated. *See supra* Section II.D. Before the 2013 IAP, *fewer* stipulations and protective measures applied to NPR-A activities and *far less* acreage was designated as "special areas." For example, the Peard Bay Special Area was created by the 2013 IAP and maintained in the 2020, 2022, and 2025 IAPs. If the 2025 IAP falls, unravelling everything behind it, so too falls the Peard Bay Special Area. Presumably, Plaintiffs do not want that result. *See Sierra Forest Legacy v. Sherman*, 951 F. Supp. 2d 1100, 1107 (E.D. Cal. 2013) (declining to vacate challenged forest management framework because it was "environmentally preferable to returning management of the Sierra Nevada to the [previous] Framework").

Further complicating matters, vacatur of the 2025 IAP (or 2020 IAP) does not compel vacatur of the 2026 Lease Sale. The Secretary's authority to conduct "an expeditious program of competitive leasing of oil and gas in the [Petroleum] Reserve" derives from Congress's leasing mandate, 42 U.S.C. § 6506a(a). Nowhere does the Petroleum Reserves Act require a lease sale to be supported by a resource management plan of any kind. So, faults found with either of the IAPs do not necessarily result in vacatur of the 2026 Lease Sale, depending on the nature of the faults. Moreover, a blanket vacatur of the 2020 IAP and 2025 IAP would remove the stipulations that

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG

Congress, via the OBBB Act, required BLM to apply to the 2026 Lease Sale (and subsequent lease sales).

Adding to those potential complications is the fact that, generally, Plaintiffs have asserted numerous, crisscrossing claims asserting violations of the APA, NEPA, the NPRPA, the ESA, and ANILCA. Success on any one of those claims would almost certainly *not* justify vacatur of all (or any) of BLM's decisions. *See Miller v. U.S. Forest Serv.*, No. 1:24-CV-00013-SLG, 2026 WL 1283870, at *4 (D. Alaska May 8, 2026) (collecting and discussing cases where court did not vacate after finding NEPA and ANILCA 810 violations). And, given the nature of most of the claims asserted by Plaintiffs, "there is at least a serious possibility that the [agency] will be able to substantiate its decision on remand" if any of those claims were successful. *Allied-Signal*, 988 F.2d at 151.[14] The Ninth Circuit's decision in *Montana Wildlife Federation v. Haaland*, discussed by CBD, only highlights the importance of briefing the remedy after a decision on the merits. 127 F.4th 1, 50-52 (9th Cir. 2025). There, the Ninth Circuit approved part of the district court's vacatur remedy and disapproved other parts, and those decisions turned on specific violations found by the court and the disruptive

_____

[14] *See Nat'l Fam. Farm Coal. v. EPA*, 966 F.3d 893, 929 (9th Cir. 2020) (remanding without vacatur where agency would "likely be able to offer better reasoning and adopt the same rule on remand" (internal quotation marks and citation omitted)); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995) ("[W]hen equity demands, the regulation can be left in place while the agency follows the necessary procedures.").

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG
- 64 -

consequences associated with specific lease sales. *Id*. Simply put, the complications described above are best evaluated in supplemental remedy briefing *after* the Court identifies a specific legal violation (if any).

Notwithstanding ConocoPhillips' request for supplemental remedy briefing (if necessary), the *Allied-Signal* factors counsel against vacatur. First, none of the claims alleged in these cases are so serious that they warrant invalidation of a congressionally mandated lease sale or a comprehensive management plan. Plaintiffs' claims consist of nitpicky NEPA and ESA arguments and allegations that BLM should have better explained its choices under APA and ANILCA. There is no "reason to believe that the [BLM] might disapprove" the 2026 Lease Sale "if it added more to the EIS," better explained why it chose the tracts that it did, or better explained why the lease sales (which have no on-the-ground impacts) will not jeopardize polar bears. *Seven County*, 605 U.S. at 185. Courts have repeatedly found that these kinds of alleged errors are not serious enough to warrant vacatur. *See Miller*, 2026 WL 1283870, at \*4.

Second, vacatur of the 2026 Lease Sale and associated leases would have significant disruptive consequences not only to ConocoPhillips's investment-backed expectations but also to Congress's repeated directives to carry out expeditious lease sales in the NPR-A. The Petroleum Reserve is a key area of interest and investment for ConocoPhillips. Losing the leases and the exclusive rights under those leases to explore

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG
- 65 -

for and potentially develop and produce oil will substantially impair ConocoPhillips's interests. Declaration of Brandi Sellepack ¶¶ 6-9, 11-15. ConocoPhillips has already invested hundreds of millions of dollars in the Petroleum Reserve and incurred substantial costs in purchasing the 2026 leases and in pre-sale investment and analysis. *Id*. ¶¶ 6-8. Vacating the leases would deprive ConocoPhillips of its competitive position because the sale has revealed the results of ConocoPhillips's exploration efforts by revealing which parcels ConocoPhillips deems valuable. *Id*. ¶¶ 11-15. That bell cannot be unrung.

In the event of any resale of the leased areas, all of ConocoPhillips's competitors would know which parcels ConocoPhillips values the most and how much it was willing to pay for particular areas, effectively inviting competitors or speculators to bid on lease tracts that ConocoPhillips presently owns and frustrating orderly development of the Petroleum Reserve. *Id*.; *see Conner v. Burford*, 848 F.2d 1441, 1461 n.50 (9th Cir. 1988) (clarifying district court's remedy order to *not* set aside oil and gas leases in order to "avoid the unnecessarily harsh result of completely divesting the lessees of their property rights"). Those concerns apply equally to every other participant in the 2026 Lease Sale, and vacating the sale would discourage participation in future lease sales, thwarting Congress's mandates—in both the NPRPA and the OBBB Act—for expeditious leasing in the NPR-A (just as Plaintiffs intend). To add insult to injury, vacatur would deprive the

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG

State of Alaska and local communities of substantial funds that would otherwise be used to support essential public services, community programs, and employment opportunities.

Under these circumstances, the Court should deny Plaintiffs' requests for vacatur should it find any merit in their claims. ConocoPhillips also respectfully reiterates its request for a fuller opportunity to address these important issues, if necessary, after the Court has ruled on the merits.

## IV.  CONCLUSION

For the reasons set forth above, ConocoPhillips respectfully requests that the Court deny Plaintiffs' motions for summary judgment and grant summary judgment in full to Defendants and Intervenor-Defendants.

DATED:  July 14, 2026.

STOEL RIVES LLP

*/s/ Ryan P. Steen*
Ryan P. Steen (Bar No. 0912084)
ryan.steen@stoel.com
Jason T. Morgan (Bar No. 1602010)
jason.morgan@stoel.com
Tiffany M. Wang (*admitted pro hac vice*)
tiffany.wang@stoel.com

*Attorneys for Intervenor-Defendant*
*ConocoPhillips Alaska, Inc.*

Certification: Counsel for ConocoPhillips certifies that this brief is 15,853 words. ConocoPhillips has sought leave to file a brief of no more than 16,000 words.

*Ctr. for Biological Diversity, et al. v. Burgum, et al.*
Case Nos. 3:20-cv-206-SLG; 3:26-cv-78-SLG; 3:26-cv-97-SLG
- 67 -